681 F.2d 1172
 18 ERC 1033, 74 A.L.R.Fed. 685, 12
Envtl. L. Rep. 20,968
 FOUNDATION FOR NORTH AMERICAN WILD SHEEP, a corporation;
Society For the Conservation of Bighorn Sheep, a
corporation; California Wildlife Federation, a corporation;
Safari Club International-Los Angeles Chapter, Inc., a
corporation; Southern Council of Conservation Clubs, Inc., a
corporation; Loren L. Lutz, an individual; Michael Valencia,
an individual, Plaintiffs and Appellants,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE; United States
Forest Service; William T. Dresser, an individual; Curtis
Tungsten, Inc., a corporation; Ronald L. Curtis, an
individual, Defendants and Appellees.
 No. 81-5044.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 4, 1982.
Decided July 22, 1982.
 
 Patrick J. Marley, Dana M. Cole, Los Angeles, Cal., for plaintiffs and appellants.
 Edward J. Shawaker, Washington, D. C., argued, for defendants and appellees; Howard Gest, Los Angeles, Cal., Thomas L. Riesenberg, Attys., Washington, D. C., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before ELY and CANBY, Circuit Judges, and EAST,* District Judge.
 ELY, Circuit Judge:
 
 
 1
 Appellant Foundation for North American Wild Sheep[1] brought this action, premised on National Environmental Policy Act (NEPA) § 102 (codified at 42 U.S.C. § 4332), challenging appellee United States Forest Service's[2] decision not to prepare an Environmental Impact Statement (EIS) prior to granting a special use permit to Curtis Tungsten, Inc. (Curtis) allowing the reconstruction and use of Road 2N06. The District Court granted the Service's[3] motion for summary judgment, holding, inter alia, that the service had taken a "hard look" at the problem and reasonably concluded that no EIS was required. We have jurisdiction pursuant to 28 U.S.C. § 1291.[4] Because we conclude that the Service's decision not to prepare an EIS was unreasonable, we reverse and remand for further administrative proceedings.
 
 I. FACTUAL BACKGROUND
 
 2
 Curtis owns and operates a tungsten mine located in the San Gabriel Mountains in the Angeles National Forest. Access to this mining operation may be had only by way of either of two roads: Road 2N06, also known as the Coldwater Canyon Truck Trail, and Road 2N09. Both roads pass through federally controlled forest land in the Angeles National Forest.
 
 
 3
 Originally constructed in 1933 by miners who used the road to haul gold ore from the San Gabriel Mountains, Road 2N06 traverses the upper reaches of Cattle and Coldwater Canyons. In 1938, heavy flooding occurred in the area, destroying the mine from which the gold ore had been extracted, and curtailing mining operations in the area. From 1938 until 1969, Road 2N06 was used regularly by private landowners,[5] the Forest Service, and the general public. In 1969, however, heavy flooding once again occurred, causing extensive damage to Road 2N06 and rendering it impassable. The road remained closed until 1980 when Curtis repaired it sufficiently to permit vehicular traffic.
 
 
 4
 Road 2N09 was constructed on the floor of the Canyon and contains numerous stream crossings. Consequently, it is subject to frequent and severe flooding, especially during the rainy winter months. From 1969 until the reconstruction of Road 2N06 in 1980, Road 2N09 provided the sole means of access to the Curtis mining claim.
 
 
 5
 On September 27, 1978, Curtis applied for a special use permit to reopen and use Road 2N06.[6] According to Curtis, Road 2N09 crosses more than twenty streams and is therefore frequently impassable due to flooding. Curtis further stated that the "down time"[7] caused by this flooding precluded the economical operation of his tungsten mine.[8] Road 2N06, according to Curtis, crosses no streams and therefore provides a more reliable means of access to his mining claim.[9] Accordingly, Curtis proposed to clear Road 2N06 of vegetation, widen it to twelve feet where necessary, and repair washed-out areas. This proposal sparked the controversy which resulted in the present appeal.
 
 
 6
 Upon hearing of the proposal to reopen Road 2N06, numerous environmentalists[10] responded with vigorous protests. Road 2N06 passes directly through the area occupied by one of the few remaining herds of Desert Bighorn Sheep (Ovis Canadensis Nelsoni ). These sheep, indigenous to the mountains of the Western United States, are purportedly extremely sensitive to environmental change. In the late nineteenth century, the sheep population was estimated to be approximately 1,500,000. Current estimates indicate that less than 40,000 remain in the mountainous regions of the United States. Because of the steadily diminishing Bighorn population, California law has long treated the sheep as a "protected" species of wildlife and prohibited all hunting for sport of the animal. Under federal law, the Bighorn is classified as a "sensitive" species entitled to special management protection.
 
 
 7
 The population of the herd directly at issue here is estimated at between 400 and 700 animals. This herd is unique in that it is one of the very few herds of Bighorn currently experiencing an increase in population.[11] The Foundation contends that reopening Road 2N06 would reverse this trend and result in the eventual destruction of this herd. The Foundation premises this contention on the critical nature of the areas through which Road 2N06 passes to the continued viability of the Bighorn herd.
 
 
 8
 Road 2N06 passes directly through the area used by the Bighorn herd for the "lambing" and rearing of its young. The Bighorn requires a unique ecosystem for these functions and any disturbance of that ecosystem may be potentially catastrophic to the survival of the herd. Road 2N06 also passes near a "mineral lick" used by the Bighorn herd. The exact composition and function of this "lick" is not precisely known but it is believed that the "lick" provides both a nutrient, probably sodium, necessary for Bighorn survival and a forum for intraspecies interaction necessary for the well-being and productivity of the herd. The reopening of Road 2N06 also presents the possibility of habitat encroachment of a more general nature. According to the Foundation,[12] the Bighorn sheep are peculiarly subject to stress-related diseases resulting from interaction with other species.[13]
 
 
 9
 In response to these and other concerns,[14] the Service drafted an Environmental Assessment (EA).[15] The EA considered four alternative courses of action. Alternative A provided for the unlimited, year-round use of both Road 2N06 and Road 2N09. Alternative B provided for the use of Road 2N06 for nine months and for the closure of Road 2N06 during the three-month period during which the sheep utilize the area for the "lambing" and rearing of their young.[16] Alternative B further provided for the use of Road 2N09 during the time Road 2N06 was closed. Alternative C provided for the year-round use of Road 2N06 and prohibited use of Road 2N09. Alternative D was the "no project" alternative and prohibited the reopening of Road 2N06. Under Alternative D, access to the Curtis mining claim was to be had exclusively by way of Road 2N09.[17] The Service evaluated the alternatives under various criteria,[18] and concluded that Alternative B should be implemented. The Service further concluded that, because Alternative B adequately mitigated the potential harm to the sheep,[19] the action would have no significant effect on the quality of the human environment and therefore no EIS was required.
 
 
 10
 After protesting this decision,[20] the Foundation instituted suit in the District Court, seeking preliminary and permanent injunctive relief barring the reopening of Road 2N06 pending the preparation of an EIS. The District Court, after hearing argument from both parties,[21] refused to issue the requested preliminary injunction. Subsequently, the Service moved for summary judgment. The District Court granted the motion,[22] holding, inter alia, that the Service had reasonably concluded that no EIS was required.[23] This appeal ensued.
 
 II. ANALYSIS
 
 11
 Before proceeding directly to the merits of the present controversy, we note the exceptionally broad scope of NEPA. See, e.g., Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm'n, 449 F.2d 1109, 1122 (D.C.Cir.1971). By its terms, NEPA mandates the preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment ...." NEPA § 102(2)(c) (42 U.S.C. § 4332(2)(c) ). See also Kleppe v. Sierra Club, 427 U.S. 390, 399, 96 S.Ct. 2718, 2725, 49 L.Ed.2d 576 (1976). "The statutory phrase 'actions significantly affecting the quality of the environment' is intentionally broad, reflecting the Act's attempt to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of every federal agency." Scientists' Institute for Public Information, Inc. v. Atomic Energy Comm'n, 481 F.2d 1079, 1088 (D.C.Cir.1973). NEPA represents a firm Congressional mandate that environmental factors be considered on an equal basis with other, more traditional, concerns. Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm'n, 449 F.2d 1109, 1122 (D.C.Cir.1971).
 
 
 12
 Our first step in resolving the issues presented by this appeal is a determination of the appropriate standard for reviewing the Service's decision that no EIS was required prior to the issuance of a permit to reopen Road 2N06. It is firmly established in this Circuit that an agency's determination that a particular project does not require the preparation of an EIS is to be upheld unless unreasonable.[24] Portela v. Pierce, 650 F.2d 210, 213 (9th Cir. 1981); City & County of San Francisco v. United States, 615 F.2d 498, 500 (9th Cir. 1980); City of Davis v. Coleman, 521 F.2d 661, 673 (9th Cir. 1975). Our review of the administrative record in the present case leads us ineluctably to the conclusion that the Service's determination that no EIS was required was, in fact, unreasonable. Accordingly, we reverse.
 
 
 13
 As noted above, NEPA requires the preparation of an EIS for all major federal actions significantly affecting the quality of the human environment. There is no dispute that the issuance of a permit to reopen and use Road 2N06 constitutes a major federal action within the meaning of NEPA.[25] Accordingly, the proper resolution of this appeal turns solely upon the reasonableness of the Service's conclusion that issuance of the permit was not an action significantly affecting the quality of the human environment.
 
 
 14
 The standard for determining whether the implementation of a proposal would significantly affect the quality of the human environment is whether "the plaintiff has alleged facts which, if true, show that the proposed project may significantly degrade some human environmental factor." Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585 at 597 (9th Cir.) (emphasis in original). See also City & County of San Francisco v. United States, 615 F.2d at 500; City of Davis v. Coleman, 521 F.2d at 673; Save Our Ten Acres v. Kreger, 472 F.2d 463, 467 (5th Cir. 1973). A determination that significant effects on the human environment will in fact occur is not essential. City of Davis, supra, 521 F.2d at 673. If substantial questions are raised whether a project may have a significant effect upon the human environment, an EIS must be prepared. City & County of San Francisco, supra, 615 F.2d at 500; Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1320 (8th Cir. 1974).
 
 
 15
 In accordance with its internal operating procedures, the Service prepared an EA[26] regarding Curtis's application for a special use permit to reopen Road 2N06. The purpose of this EA was to determine whether an EIS was required, to facilitate preparation of an EIS if necessary, and to aid the Service in complying with NEPA if no EIS was required.[27] 40 C.F.R. § 1508.9; 7 C.F.R. § 3100.20. The EA purported to consider the impact on the Bighorn sheep resulting from the reopening of Road 2N06, considered the various alternatives set forth above, and concluded that no EIS was required. Our review of the EA, along with its appendices,[28] leads us to conclude that the Service failed to take the requisite "hard look" at the environmental consequences of its action and that its conclusion that reopening Road 2N06 would have no significant effect on the human environment was unreasonable. See Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976).
 
 
 16
 The EA at issue here failed to address certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS.[29] See Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d at 611 (Karlton, dissenting); Chelsea Neighborhood Ass'ns v. U. S. Postal Service, 516 F.2d 378, 389 (2d Cir. 1975). Perhaps the most glaring shortcoming of the EA is its failure to include any estimate of the expected amount of truck traffic on Road 2N06 from the Curtis mine. We fail to see how the effect of reopening Road 2N06 can be evaluated intelligently without some consideration of the amount of traffic likely to flow along the road.[30] Moreover, the EA lists as one of its assumptions that unauthorized vehicular traffic will occur on Road 2N06 should it be reopened. No effort was made to quantify the amount of unauthorized traffic nor was the effect on the Bighorn of this traffic evaluated. The omission of any meaningful consideration of such fundamental factors precludes the type of informed decision-making mandated by NEPA.
 
 
 17
 The EA similarly fails to address certain other issues raised by correspondence received by the Service in response to its initial draft of the NEPA.[31] Road 2N06 passes close to a "mineral lick" used by the Bighorn. The California Department of Fish and Game, in a letter to the Forest Service,[32] raised serious questions regarding the effect of traffic on Road 2N06 upon the sheep's use of this "lick." According to the Department of Fish and Game, reopening Road 2N06 would lead to abandonment of the "lick" and impair "the year-round social activity at the lick (that) is critical in maintaining the high level of productivity of the local herd."[33] The Service failed to address either the effect of traffic upon the sheep's use of the "lick" or the effect of the loss of the mineral lick upon the sheep's continued viability. The EA further contained no discussion of whether there were other mineral licks available for use by the sheep.
 
 
 18
 Other significant questions raised by respondents to the initial draft of the EA were similarly ignored or, at best, shunted aside with mere conclusory statements. Substantial questions regarding the sheep's susceptability to stress-related diseases were raised by numerous responses to the draft EA. One response[34] indicated that stress caused by traffic on Road 2N06 could increase sheep mortality by reducing the sheep's resistance to disease, could inhibit reproduction, and could result in increased aberrant behavior among the young sheep. Rather than directly addressing this issue, the Service relied heavily upon instances where the sheep have indicated some tolerance of man's intrusion upon their habitat.[35] Yet, with one exception discussed below, the circumstances surrounding these examples of the sheep's tolerance of man appear totally dissimilar to the potential intrusion at issue here. The sightings relied upon by the Service were made by hikers, sympathetic to the sheep, who apparently endeavored to induce as little apprehension in the sheep as possible. The EA provides no foundation for the inference that a valid comparison may be drawn between the sheep's reaction to hikers and their reaction to large, noisy ten-wheel ore trucks.[36] If such a comparison legitimately may be drawn, the EA should so indicate. Moreover, the EA fails to provide any indication that the Service fully considered the potentially differing reactions of the sheep depending upon whether man's intrusion was occasional or relatively constant. We note, however, that the two reports regarding the Bighorn contained in Appendix J of the EA[37] do not deal with the regular, long-term intrusion of man into the Bighorn habitat.[38] Rather, they deal with the Bighorn's response to isolated and sporadic contacts with man. We are therefore left to speculate whether the Bighorn's supposed tolerance would continue if man were a regular visitor. Yet the very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for such speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action. See Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d at 594; Jette v. Bergland, 579 F.2d 59, 63 (10th Cir. 1978).
 
 
 19
 The Service apparently[39] relied heavily upon the observed reaction of the Bighorn to the construction and use of Highway # 2 (Angeles Crest) in the Kratka Ridge country. According to a study, contained in Appendix J of the EA, "(t)he Bighorn retreated before the disturbance of the advancing highway, but as the highway progressed they flowed back around the activity of the construction area and re-occupied the relatively inactive portions of the completed highway." (Letter from A. Lewis, District Ranger, EA, App. J.) The validity of this study as a means of projecting the Bighorn's reaction to the reopening of Road 2N06 is questionable. When threatened, the sheep retreat upward to higher ground, utilizing their incredible climbing ability to negotiate precipices impassable to most other creatures. Because upward retreat provides their sole means of defense, the sheep are highly disturbed by the presence of other creatures above them. Highway # 2 passed below the area occupied by the sheep, as does Road 2N09. Moreover, natural bridges provided the sheep with a means of crossing over Highway # 2. In contrast, Road 2N06 passes through the upper reaches of the Cattle and Coldwater Canyons and, at times, above the area occupied by the sheep.[40] The EA fails to address this issue despite the fact that the study upon which it relied in concluding that the sheep would tolerate highways expressly stated that "the natural bridges ... may be the key to their tolerance of the highway barriers." (Letter from A. Lewis, District Ranger, EA, App. J.)
 
 
 20
 The Service vigorously asserts that the mitigation measures incorporated into the chosen alternative (Alternative B ) reduce the potential impact upon the Bighorn to insignificant levels. We cannot agree.
 
 
 21
 Alternative B contains certain measures designed to minimize the adverse impact of Road 2N06 upon the continued well-being of the sheep. First, Alternative B provides for the closure of Road 2N06 from April 1 until June 30 in order to avoid undue disturbance of the sheep during the "lambing" season.[41] Second, Alternative B requires the maintenance of a secure, locked gate and a 24-hour guard at the entrance to Road 2N06.[42] Third, a monitoring system is to be undertaken and Road 2N06 is to be closed in the event of a forty percent reduction in the use of the area by the sheep. Finally, the Service contends that the area can be repopulated with Bighorn sheep from other areas if necessary. The efficacy of these mitigation measures was severely attacked by numerous responses to the original draft of the EA.
 
 
 22
 Based upon our review of the record, we are convinced that, despite the above-referenced mitigation measures, the reopening of Road 2N06 is a major federal action that "may significantly degrade some human environmental factor." Columbia Basin Land Protection Ass'n v. Schlesinger, supra, 643 F.2d at 597. We are also convinced that the Service's conclusion to the contrary was plainly unreasonable.
 
 
 23
 We first address the Service's contention that the closure of Road 2N06 during the three-month "lambing" season will be adequate to mitigate the impact of the road upon the sheep. The Bighorn require a finely tuned ecological balance for their "lambing" and rearing functions and, according to Appendix J of the EA, "(a)ny disturbance of these (lambing) areas would be a catastrophe to the sheep as the ecosystems needed for lambing are extremely limited in this area." (Letter from A. Lewis, District Ranger, EA, App. J.)Thus, it appears that the continued use of the lambing area through which Road 2N06 passes is essential to the continued productivity of the herd at issue here.[43] Respondents to the draft EA strongly attacked the Service's assumption that the sheep would return to the area to perform their most sensitive function after that area had been invaded by man for nine months. The Service provided no basis for its assumption in the EA. Evaluation of the reasonableness of this assumption is doubly difficult because of the Service's failure to provide data regarding the quantity of traffic expected to flow through the area. The absence of this crucial information renders a decision regarding the sheep's reaction to the traffic on Road 2N06 necessarily uninformed. Without some sort of informed idea of how the sheep will react to Road 2N06 while it is open, it is impossible to determine whether they will return to the area to "lamb" once the road has been closed.[44] Certainly substantial questions are raised whether the closure of Road 2N06 for three months will serve to mitigate the potential harm to the sheep. Where such substantial questions are raised, an EIS must be prepared. See City & County of San Francisco v. United States, supra, 615 F.2d at 500; City of Davis v. Coleman, supra, 521 F.2d at 673; Save Our Ten Acres v. Kreger, 472 F.2d 463, 467.[45]
 
 
 24
 We also find the provision for a locked gate and a guard at the entrance to Road 2N06 insufficient to reduce the environmental impact of the proposed reopening of the road to less than significant levels. Initially, it is noteworthy that one of the assumptions expressly set forth in the EA is that increased unauthorized traffic on Road 2N06 will result from the reopening of the road regardless of the precautions taken to prevent such traffic. Thus the efficacy of this measure is, under the Service's own assumptions, doubtful. Further this mitigation provision will only affect the quantum of harm resulting from unauthorized traffic. Consequently, it is manifestly insufficient to mitigate the harm to the sheep emanating from the authorized use of Road 2N06 by Curtis ore trucks and is inadequate to remedy the flaws contained in the Service's analysis of that harm.
 
 
 25
 We also find the monitoring and repopulation provisions contained in Alternative B insufficient to support a reasonable conclusion that the reopening of Road 2N06 will have no significant impact upon the quality of the human environment. NEPA expresses a Congressional determination that procrastination on environmental concerns is no longer acceptable. See Jette v. Bergland, 579 F.2d at 63. Yet the provision requiring closure of Road 2N06 in the event of a forty percent reduction in the use of the area by the sheep is just this type of procrastination. It represents an agency decision to act now and deal with the environmental consequences later. Such conduct is plainly inconsistent with the broad mandate of NEPA. Moreover, the provision implicitly treats a forty percent reduction in the sheep's use of the area surrounding Road 2N06 as insignificant. No support for such a conclusion is found in the record.
 
 
 26
 Reliance on the repopulation scheme as a basis for the conclusion that the reopening of Road 2N06 will have no significant impact on the quality of the environment ignores the requirement, found in the regulations of both the Council on Environmental Quality and the Service itself, that "the significance of an action must be analyzed in several contexts such as society as a whole ..., the affected region, the affected interests and the locality." 40 C.F.R. § 1508.27; Forest Service Manual, Ch. 1950 § 38. In order for repopulation of the herd at issue here to be required, there must necessarily be an initial reduction in the population of the herd as well as a corresponding reduction in the sheep population as a whole. This overall population reduction was ignored by the Service. Consideration of the effect of the proposal on the overall population is especially critical when dealing with a species as sensitive as the Bighorn sheep. The Bighorn population has declined from approximately 1,500,000 in the late nineteenth century to approximately 40,000 at the present, a decline of roughly 97% over a one-hundred-year span. Given this rapid population decline, it was clearly unreasonable for the Service to conclude that the reopening of Road 2N06 would have no significant effect on the quality of the human environment without full consideration of the project's potential impact upon the overall population of the sheep. Moreover, the transplant of sheep from another area to the area at issue here would necessarily result in a reduction in sheep population in the area from which the transplanted sheep were removed. This factor was also ignored by the Service.
 
 
 27
 An examination of the pertinent Forest Service regulations supports our conclusion that the Service was unreasonable in failing to prepare an EIS. 40 C.F.R. § 1508.27(b)(4)[46] provides that one consideration in determining whether a proposed action will significantly affect the quality of the human environment is "(t)he degree to which the effects on the quality of human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b) (4). The term "controversial" refers "to cases where a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." Rucker v. Willis, 484 F.2d 158, 162 (4th Cir. 1973). In the present case, the Service received numerous responses from conservationists, biologists, and other knowledgeable individuals, all highly critical of the EA and all disputing the EA's conclusion that reopening Road 2N06 would have no significant effect on the Bighorn sheep. Both the California State Department of Natural Resources and the California State Department of Fish and Game responded to the EA, expressing disagreement with the EA's conclusions regarding the likely effect of reopening Road 2N06. We believe that this is precisely the type of "controversial" action for which an EIS must be prepared. To conclude otherwise would violate the well-established principle that an agency is bound by the terms of its own regulations and would render 40 C.F.R. § 1508.27(b)(4) a nullity.[47] See Columbia Basin Land Protection Ass'n v. Schlesinger, supra, 643 F.2d at 610 (Karlton, dissenting); Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164, 1178 (6th Cir. 1972).[48]
 
 III. CONCLUSION
 
 28
 We are mindful that it is not the province of this Court to substitute its judgment for that of the Service. Yet it must also be remembered that "(t)he spirit of the (NEPA) would die aborning if the facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review." Save Our Ten Acres v. Kreger, 472 F.2d 463, 466 (5th Cir. 1973).
 
 
 29
 In the present case, the Service failed to comply with its own regulations and, furthermore, failed to consider numerous issues obviously relevant to a determination of the likely effect of reopening Road 2N06 on the environment. Under these circumstances, we conclude that the Service's determination that no EIS was required was plainly unreasonable. Accordingly, the judgment of the District Court is reversed and the case is remanded for further proceedings not inconsistent with this Opinion.
 
 
 30
 REVERSED.
 
 
 
 *
 The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 There are, in fact, six other appellants in addition to the Foundation: the Society for the Conservation of Bighorn Sheep, the California Wildlife Federation, the Safari Club International, the Southern Council of Conservation Clubs, Loren L. Lutz and Michael Valencia. For ease of discussion, appellants will be referred to collectively as the "Foundation."
 
 
 [2]
 Also joined as defendants were the United States Department of Agriculture, William T. Dresser, Forest Supervisor, in his official capacity, Curtis Tungsten, Inc., and Ronald Curtis. For ease of discussion, these parties will be referred to collectively as the "Service."
 
 
 [3]
 The motion was granted in favor of all the defendants-appellees
 
 
 [4]
 In the lower court, the Service contended that the Foundation had failed to exhaust its administrative remedies and that such failure precluded this action. This contention has been abandoned on appeal
 
 
 [5]
 There are only three parcels of private land in the area: the Walker Ranch, the Thompson Ranch, and the Widman Ranch
 
 
 [6]
 Curtis previously had obtained a special use permit allowing him to use Road 2N09
 
 
 [7]
 Curtis initially estimated that Road 2N09 was impassable for 1.14 months per year. This estimate was consistently revised upward as time progressed
 
 
 [8]
 No issue is presented regarding Curtis's entitlement to operate the mine. See Multiple-Use Sustained-Yield Act of 1960, Pub.L. 86-517, 74 Stat. 215, 16 U.S.C. § 528-31
 
 
 [9]
 It should be noted, however, that Road 2N06 was originally closed because of flooding
 
 
 [10]
 In addition to responses from environmentalists and biologists, the Service also received highly critical responses from the California State Department of Natural Resources and the California State Department of Fish and Game
 
 
 [11]
 Despite the increasing population, the survival rate of Bighorn lambs was characterized as "poor" in the Environmental Assessment ("EA") drafted by the Service in response to environmental concerns, see text accompanying notes 26 and 27, infra
 
 
 [12]
 The information contained in the text of this Opinion is gleaned from the EA and its appendices. No information outside the administrative record has been considered
 
 
 [13]
 According to the Foundation, a herd of approximately 20 Bighorn sheep died of stress pneumonia in the Lava Beds National Monument in Northern California. These deaths were attributed to the Bighorn coming in contact with other animals. This information, however, is not contained in the administrative record and, accordingly, we in no way rely upon it in reaching our decision
 
 
 [14]
 The EA also dealt with the effect of reopening Road 2N06 on, inter alia, access to private land, the flood plain, visual resources, the environment, and the output of tungsten ore
 
 
 [15]
 The Service initially prepared a Draft EA. The Draft was circulated and numerous comments received. The Service then made minor revisions in the Draft and reissued it as the Final EA. For the most part, the Final EA did not respond in other than a conclusory fashion to the comments previously received
 
 
 [16]
 The "lambing" and rearing of young sheep generally occurs between April 1 and June 30
 
 
 [17]
 Alternative D was the choice recommended by the vast majority of the responses to the Draft EA
 
 
 [18]
 See note 14, supra
 
 
 [19]
 Alternative B contained several mitigation measures designed to reduce the impact of reopening Road 2N06. These measures are discussed below
 
 
 [20]
 The decision was protested both orally and in writing and the protest was clearly sufficient to put the Service on notice that further proceedings were contemplated. See Reporter Transcript, September 8, 1980 at 8-9
 
 
 [21]
 The District Court permitted the Foundation to present expert testimony. We in no way rely upon that testimony in deciding this appeal
 
 
 [22]
 See note 3, supra
 
 
 [23]
 The District Court's other conclusions are not at issue in the present appeal
 
 
 [24]
 The Service apparently contends that the appropriate standard for reviewing the decision not to prepare an EIS is the "arbitrary and capricious" standard. We disagree. We believe that the "arbitrary and capricious" standard is primarily applicable to reviewing an agency's discretionary decisions. The decision to prepare an EIS, however, is not committed to the agency's discretion. An EIS must be prepared for actions that may significantly affect the quality of the human environment. The mandatory nature of this directive makes the "reasonableness" standard the more appropriate standard of review. See City & County of San Francisco v. United States, 615 F.2d 498, 500 (9th Cir. 1980); Jette v. Bergland, 579 F.2d 59, 64 (10th Cir. 1978); Minnesota Public Interest Research Group v. Butz, 498 F.2d 1314, 1320 (8th Cir. 1974); Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C.Cir.1971)
 
 
 [25]
 40 C.F.R. § 1508.18(a)(4) provides that federal actions include actions approved by permit. See also City of Davis v. Coleman, 521 F.2d 661, 673 n.15 (9th Cir. 1975)
 
 
 [26]
 See note 15, supra
 
 
 [27]
 The EA itself listed as its only objective a determination of the appropriate route of access to the mining claims located in Cattle Canyon
 
 
 [28]
 See note 12, supra
 
 
 [29]
 We do not suggest that the EA must conform to all the requirements of an EIS. We merely assess whether the EA, offered by the Service as the prime statement of reasons for its decision not to prepare an EIS, is sufficient to establish the reasonableness of that decision
 
 
 [30]
 Estimates of the expected traffic along Road 2N06 were provided by persons protesting the decision to reopen the road. We are unable to find any such estimates made by the Service itself. Nor did the Service expressly accept or reject those estimates provided by others
 
 
 [31]
 Responses critical of the Draft EA were received from biologists, zoologists, the California Department of Natural Resources, and the California Department of Fish and Game. It is interesting that the Service relied heavily upon a study conducted by James DeForge for its estimates of the population of the herd at issue here yet dismissed without comment Mr. DeForge's contention that the reopening of Road 2N06 would be very harmful to the sheep
 
 
 [32]
 This letter is included in Appendix H to the EA
 
 
 [33]
 Letter from Fred A. Worthy, Regional Manager, Cal. Dept. of Fish & Game, EA, App. H
 
 
 [34]
 Letter from James DeForge, EA, App. H
 
 
 [35]
 These studies appear in the EA at Appendix J
 
 
 [36]
 It should be remembered that the EA also failed to specify the expected amount of traffic on Road 2N06
 
 
 [37]
 One study relied upon by the Service consisted solely of sightings of the Bighorn over a two-day period in April, during the Bighorn lambing season. The second study consisted of intermittent sightings over a period of several years
 
 
 [38]
 The Service also apparently relied upon a letter from A. Lewis, District Ranger. This letter, found in Appendix J to the EA, stated that the Bighorn will tolerate man's presence "provided ... (man does) not preempt their territory." The EA contains no discussion of what type of conduct is sufficient to "preempt" the sheep's territory
 
 
 [39]
 We say "apparently" because the EA fails to disclose precisely upon what information the Service did in fact rely. No discussion of the relative reliability of competing studies is presented in the EA
 
 
 [40]
 This issue was raised by several responses to the Draft EA
 
 
 [41]
 The sheep are purportedly most sensitive to habitat encroachment at this time
 
 
 [42]
 One of the assumptions contained in the EA is that the reopening of Road 2N06 will result in increased unauthorized use of the road regardless of precautions taken to prevent such use
 
 
 [43]
 See note 11, supra
 
 
 [44]
 We also note that this mitigation measure does not address the sheep's need for, and use of, the mineral lick
 
 
 [45]
 As noted elsewhere, preparation of an EIS is not discretionary
 
 
 [46]
 The Forest Service's regulations are identical to those promulgated by the CEQ and are contained in the Forest Service Manual
 
 
 [47]
 It also appears that the Service's action in the present case was in violation of 40 C.F.R. § 1508.27(b)(5). That section mandates consideration of "(t)he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks ..." in determining whether the action is one that may significantly affect the quality of the human environment. Here, the effect of reopening Road 2N06 appears to be uncertain, as evidenced by the disagreement between the Service and the individuals challenging the EA
 
 
 [48]
 The Service relies heavily on the Multiple-Use Sustained-Yield Act of 1960, Pub.L. 86-517, 74 Stat. 215, 16 U.S.C. § 528-31 as supporting its decision to reopen Road 2N06. This reliance is misplaced. The Act, while arguably supporting the reopening of Road 2N06, can have no effect on the Service's duty under NEPA to prepare an EIS. NEPA "requires federal agencies to comply with the duties specified therein except when such compliance is precluded by statute." Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164, 1176 (6th Cir. 1972) (emphasis added). The Multiple-Use Sustained-Yield Act merely mandates that access to preexisting mining claims be granted to the owners of those claims. It neither requires the grant of the most desirable means of access nor in any way relieves federal agencies of their duties under NEPA