GREENPEACE U.S.A., a California non-profit corporation, Plaintiff,

v.

William E. EVANS, Assistant Administrator for Fisheries, National Marine Fisheries Service, et al., Defendants.

No. C86–1676R.

United States District Court, W.D. Washington.

June 12, 1987.

Stephan C. Volker, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., Rod-

ney L. Brown, Jr., Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for plaintiff.

Michele Kuruc, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Susan Barnes, Asst. U.S. Atty., Seattle, Wash., for defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on cross-motions by plaintiff and defendants for summary judgment. Having reviewed the motions, together with all documents filed in support and in opposition, and being fully advised, the court finds and rules as follows:

## I. FACTUAL BACKGROUND

This case involves a challenge by plaintiff Greenpeace U.S.A. ("Greenpeace"), a nonprofit conservation organization, to the legality of a decision by defendant United States government officials in the Department of Commerce (collectively referred to as "the government") to issue a permit under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 *et seq.*, authorizing scientific research on killer whales in Puget Sound.

The MMPA decrees a moratorium on the taking of marine mammals, including taking by harassment, hunting, capture, collection or killing. *Id.* §§ 1362(12) and 1371. However, an exception to this general prohibition allows the Secretary of Commerce to issue permits for the taking of marine mammals when the purpose is scientific research or public display. *Id.* § 1371(a)(1). Pursuant to §§ 1362(11)(A) and 1374, the Secretary of Commerce has delegated his authority to issue permits for the taking of killer whales to the National Oceanic and Atmospheric Administration ("NOAA") and its subagency, the National Marine Fisheries Service ("NMFS").

In February of 1986, A. Rus Hoelzel, a graduate student in England, submitted an application to NMFS for a permit allowing him to conduct scientific research involving harassment of killer whales within the purview of the MMPA. Hoelzel requested permission to collect 45 skin and blubber samples over a five year period from the resident and transient populations of killer whales in Puget Sound by means of darts mounted on the tips of arrows and fired by a long-bow from a 16–foot motor boat maneuvered close to the whales. Hoelzel sought the samples in order to analyze the level of organochlorine contamination in the whales, their diet and their paternity, kin relationships and genetic variation.

The NMFS published a summary of the project and a request for public comments in the Federal Register, 51 Fed.Reg. 11334 (1986), as well as sending Hoelzel's application to the National Marine Mammal Laboratory, the NMFS regional office in Seattle, and the Marine Mammal Commission. This Commission is a presidentially appointed body which is required to review applications for marine mammal permits under the MMPA. 16 U.S.C. §§ 1371(a)(1), 1401–1402.

The Marine Mammal Commission recommended approval of the application provided that the whales were monitored for adverse effects resulting from the harassment and that Hoelzel's research in succeeding years would be subject to approval by the NMFS after review of the previous year's activities. Of the comments received from the public, only two from the Whale Museum in Friday Harbor, Washington supported the project. Approximately ten other commenters strenuously opposed the issuance of the permit. The National Marine Mammal Laboratory in the Department of Commerce and the Regional Director of the NMFS also expressed serious concerns about the validity of the proposed scientific techniques and the possibility of long term alteration of the whales' behavior in response to the harassment.

On August 22, 1986, the NMFS issued a permit to Hoelzel authorizing the harass-

ment of 86 killer whales [1] and the collection by dart biopsy of 45 tissue samples over a five year period for the purpose of studying organochlorine contamination, diet and pod integrity in the killer whales of Puget Sound.[2] The permit included some conditions not contained in Hoelzel's original application including the following: during the first year, Hoelzel could collect at most five skin biopsies; Hoelzel was to contact the NMFS regional office at least 72 hours before each research activity so that the regional director in his discretion could arrange for an observer; Hoelzel was to consult the NMFS regional office each year before beginning research activities; Hoelzel could not try to dart a given whale more than once per day nor more than a total of twice during the period of the permit; he could not collect samples from transient pods until dart wounds on whales from resident pods had healed and he had received written authorization from the NMFS; he was to suspend all research activities if there was any indication of harm to the health of a previously darted whale or if a nontargeted whale was struck with a dart or a targeted whale struck anywhere but the dorsal midbody region; and the research was to be terminated immediately if a NMFS observer determined that it was causing substantial disruption to the pods being sampled.

Greenpeace petitioned the NMFS to revoke the permit on the grounds that the NMFS had not complied with applicable environmental laws. This petition was denied as was Greenpeace's further request for reconsideration of the petition.

Greenpeace then filed the instant lawsuit alleging that, in issuing the permit to Hoelzel, defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the MMPA. On May 26, 1987, this court granted Greenpeace's request for an order temporarily restraining defendants from allowing harassment of killer whales

under the permit issued to Hoelzel. The court now addresses the merits of the case as outlined in the cross-motions for summary judgment filed by Greenpeace and the government.

## II. LEGAL ARGUMENT

Greenpeace's central argument in this case is that the government violated NEPA by failing to prepare an environmental impact statement ("EIS") or an environmental assessment ("EA") concerning the research proposed in Hoelzel's application for a permit.

In determining whether a permit for scientific research should be issued under the MMPA, the NMFS must follow the dictates of NEPA, which requires that federal agencies prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The guidelines for complying with NEPA are set forth in regulations promulgated by the Council on Environmental Quality. 40 C.F.R. 1500 *et seq.* These regulations provide that, in determining whether an EIS must be prepared, the federal agency must decide whether the proposed action normally requires an EIS or whether the significance of the action is so unclear that an EA needs to be done in order to analyze whether an EIS is necessary. *Id.* § 1501.4. Alternatively, the agency must determine whether the proposal falls into a category of actions that do not have a significant effect on the human environment and thus qualifies for a "categorical exclusion" ("CE") from the requirement for the preparation of an EA or EIS. *Id.* §§ 1501.4(a)(2); 1508.4.

As the government points out, NOAA has determined that permits for scientific research under the MMPA constitute the type of action qualifying for a CE. 49 Fed.Reg. 29652 (1984). However, even if a CE would normally be applicable, the agency must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental ef-

---

**1.** According to current estimates based on photo identification surveys, this constitutes the entire population of killer whales in Puget Sound.

**2.** A "pod" is a distinct social group of whales who live and travel together.

fect." 40 C.F.R. § 1508.4. In accordance with this requirement, NOAA issued a regulation requiring the preparation of an EA or EIS for activities that are generally categorically excluded when they "could result in any significant impacts." 49 Fed.Reg. 29647 (1984).

Factors which NOAA must consider in determining whether a proposed action would "significantly" affect the environment include "the degree to which the effects on the quality of the human environment are likely to be highly controversial," *id.* § 1508.27(4); "the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," *id.* § 1508.27(5); "the degree to which the action may establish a precedent for future actions with significant effects," *id.* § 1508.27(6); and "whether the action is related to other actions with individually insignificant but cumulatively significant impacts," *id.* § 1508.27(7). If any of these factors is present, the preparation of an EA or EIS is required.

In this case, Greenpeace contends that Hoelzel's request for a permit does not qualify for a categorical exclusion because the proposed conduct would significantly affect the quality of the human environment. Greenpeace argues that Hoelzel's proposal for collecting skin and blubber samples from 45 killer whales by dart biopsy is highly controversial, that it involves highly uncertain effects and unknown risks of disrupting the killer whales, that it establishes a precedent about future proposals for harassment of the whales, and that it may result in cumulatively significant impacts. The government responds that the issuance of the permit is not a major federal action and does not have the potential for significantly affecting the quality of the human environment, that none of the exceptions to the categorical exclusion for research permits is applicable and that, therefore, the NMFS was not required to prepare an EA or EIS concerning the proposed research.

**3.** For more than a decade, the killer whales in Puget Sound have been the subject of intensive

■ The appropriate standard for reviewing an agency's decision not to prepare an EA or EIS is one of reasonableness. In other words, the determination by NMFS that Hoelzel's proposed research was not an action significantly affecting the quality of the human environment and thus qualified for a categorical exclusion must be upheld unless unreasonable. *Jones v. Gordon,* 792 F.2d 821, 827 (9th Cir.1986); *Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir. 1982). But the court also notes that Greenpeace has only to raise substantial questions about whether the research *may* have significant environmental effects in order to demonstrate the unreasonableness of the agency's position. *Id.* at 1178. The court will examine each of Greenpeace's objections in turn.

■ First, Greenpeace argues that the effects of the proposed research are highly controversial. Used in this context, the term "controversial" refers to "[the existence of a] substantial dispute ... as to the size, nature, or *effect* of the major federal action rather than to the existence of opposition to a use." (emphasis in original) *Id.* at 1182 (quoting *Rucker v. Willis,* 484 F.2d 158, 162 (4th Cir.1973)). Greenpeace emphasizes that all but one of the commenting organizations and individuals opposed the issuance of the permit. Among those criticizing the proposed research were knowledgeable scientists with years of experience studying killer whales who raised objections about the potential adverse effects of harassing the whales. The government's own National Marine Mammal Laboratory and the Northwest regional office of the NMFS also expressed serious reservations and concerns about the proposed research including questions about the darting process, the impact of the harassment on the whales' social structure, the possibility of jeopardizing other researchers' ability to continue collecting data by causing the whales to avoid contact with vessels or even to leave the area,[3] the ne-

study by numerous scientists gathering data by

cessity for the research and the validity of the scientific techniques.

The government responds that, based on the administrative record compiled by the NMFS, the effect of the proposed research was not highly controversial. In doing so, the government must concede that the Decision Memorandum issued by the NMFS concerning its review of Hoelzel's permit application does not specifically address the issue of whether the proposed research in particular qualifies for a categorical exclusion based on the existence of controversy about its effects. On this point, the memorandum states only that

> [s]cientific research permits are, in general, categorically excluded from the requirement to prepare an Environmental Assessment or Environmental Impact Statement (NOAA Directives Manual 02–10 Environmental Review Procedures, 49 FR 29647, para. 5.c.(3)(g)) since, as a class, they do not have a significant environmental impact and the activities do not come within any of the exceptions to the categorical exclusion.

Administrative Record ("AR") 66. This boilerplate language does not fulfill the NMFS' responsibility to consider whether an exception to the categorical exclusion applies in this particular case on the grounds that the proposed research is controversial.

The government urges the court to look at the Decision Memorandum as a whole, particularly the section entitled "Discussion and Recommendations" in which the concerns raised by the NMFS regional office and the National Marine Mammal Laboratory are briefly outlined and the resulting conditions placed on the permit are described.[4] Although this section does shed more light on the reasoning of the NMFS, it does not explain in the least why the effects of the research should be deemed uncontroversial. On the contrary, the fact that the NMFS felt it necessary to hedge its issuance of the permit with so many restrictions and conditions points to quite the opposite conclusion, namely that the potential effects were the subject of considerable controversy among both the public and governmental commenters on the proposed research.[5]

---

nonintrusive means of observation and photography.

**4.** The full text of this section is as follows: "The Marine Mammal Commission's recommendations concerning monitoring activities, having observers accompany the researcher, and reauthorization in the second and following years have been made a part of the permit.

The Northwest Region expresses concerns regarding the controversial nature of the research and the potential for adverse effects on the whales. The NWR proposed recommendations that would ensure that the research and the effects of the research on the animals will be closely monitored. These recommendations have been made a part of the Permit.

The National Marine Mammal Laboratory expressed concern regarding the impact of the research to individuals and pod dynamics/behavior, the effect on on-going studies, and an assessment of the scientific techniques being employed and their usefulness. In view of the NMML concerns and recommendations, the Permit has been conditioned as follows: 1) There is a restriction on the number of animals initially authorized to be taken; 2) The Permit Holder must contact the Northwest Region prior to initiation of research activities so that the activities may be closely monitored; and 3) Detailed reports must be submitted regarding the

animals' reaction to the research activities and the healing of wounds induced by sampling. Also, a Special Condition has been included in the Permit to suspend research activities if a NMFS designated observer determines that the research is causing a substantial disruption to the pod(s).

Dr. Paul Spong's request for a public hearing due to the potential harassment of the killer whale has been denied since his concerns are addressed in the record. Further, the Permit is [sic] has been written to minimize the effect of the research activities on the killer whale population of Puget Sound.

The proposed research is consistent with the purposes and policies of the Marine Mammal Protection Act. We do not anticipate any adverse impacts upon the affected population or its ecosystem as a result of these activities. For these reasons, I recommend that you approve this request for a permit." AR 67–68.

**5.** In both its briefs and at oral argument, the government stressed that, although NMFS personnel did originally express serious concerns about the proposed research, they agreed to the issuance of the permit as conditioned. *See* Affidavit of Dr. Howard Braham, Exhibit 1 to Defendants' Reply to Plaintiff's Application for a Temporary Restraining Order and Motion for Preliminary Injunction. Dr. Braham, Director of the National Marine Mammal Laboratory of

■ This naturally brings the court to Greenpeace's second argument in favor of finding an exception to the categorical exclusion. Greenpeace contends that virtually every aspect of the proposed research, including the environmental effects and the validity of the scientific techniques, is fraught with uncertainty and that an EA or EIS is thus necessary.

The government responds that the NMFS did consider whether unique or unknown risks existed and concluded in the Decision Memorandum that no adverse impacts on the affected population or its ecosystem were anticipated. Greenpeace challenges the basis for this conclusion, pointing to the expressions of concern about possible alteration of whale behavior voiced by long time whale observers as well as NMFS personnel.

Greenpeace also submits a declaration from James Darling, a zoologist specializing in whale behavior for the last fifteen years. In 1986 Darling did an assessment for the government of British Columbia in Canada of the impact of human activities on the killer whales in an ecological reserve along the coast of Vancouver Island. Based on his review of available information, he concluded that killer whales are disturbed by whale-oriented human activities like research and whale watching and that this stress can cause long term alterations of behavior. He also expressed his opinion that, in view of the significant additional disturbance to the whales which would result from the proposed research and the lack of clarity about the need for the research, it is not justified until more study is done on the effect of human activities on the Puget Sound whale population.

The government quickly points out that Darling's study was not published until December of 1986, several months after the permit in question was issued. However, the government does not deny that the information on which Darling relied and the literature which he surveyed was all available in May of 1986 while NMFS was still considering Hoelzel's application.

■ The government further objects to Darling's declaration on the grounds that it is not this court's function to second-guess NMFS' conclusions by reviewing sources outside of the administrative record. The court agrees and does not seek to make any scientific or technical findings. But the court can take into account extra-record sources in order to determine whether or not the NMFS adequately considered all of the relevant factors concerning the environmental effects of the proposed research. *American Petroleum Institute v. Knecht*, 456 F.Supp. 889, 911 (C.D.Cal. 1978), *aff'd*, 609 F.2d 1306 (9th Cir.1979); *No Oilport! v. Carter*, 520 F.Supp. 334, 345–46 (W.D.Wash.1981). In this case, Darling's declaration assists the court in concluding that the NMFS did not adequately consider the risks of long term adverse impacts on the killer whale population of Puget Sound.[6]

the Northwest and Alaska Fisheries Center, which is part of the NMFS, stated at p. 4 that "[t]he permit, as issued, addressed every concern raised by various review agencies, and placed numerous limitations/restrictions on this research. As conditioned, we support the issuance of this permit on scientific grounds." Again, the court finds that, even though the inclusion of numerous restrictions in the permit may have allayed the concerns of NMFS personnel, it still does not tend in any way to indicate that the effects of the research were uncontroversial.

6. The government attacks as speculative Darling's opinions about the possibility of adverse effects on the whales. But the ultimate accuracy of Darling's conclusions is not the point here. The question is instead whether Hoelzel's proposed research poses a potential unknown risk of environmental harm. Darling's declaration does assist the court in concluding that the risks of Hoelzel's plan are not fully understood.

The court also notes the existence of several studies concerning adverse impacts of human behavior on whales which the government produced to Greenpeace in the course of discovery in this case and which Greenpeace submitted to the court in support of its argument that the government knew or should have known of the possibility of adverse impacts on the killer whales resulting from Hoelzel's proposed research. *See* Defendants' Answers to First Set of Interrogatories and Requests for Production of Documents to Plaintiffs (Interrogatory Nos. 1–7) (Request Nos. 1–5) and Defendants' Answers to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents to Defendants (Interrogatory Nos. 8–17) (Request Nos. 6–14).

Even without considering Darling's evidence, the court finds that the administrative record is deficient on the subject of potential risks posed by the proposed research. Virtually all of the comments, including those from NMFS personnel, raise the issue of possible adverse effects on the whales. The Decision Memorandum does not address the objections. Instead it simply sets forth the conditions imposed on the permit with the apparent assumption that they will take care of any problem.

In a prior case also involving killer whales, the Ninth Circuit considered and rejected a similar argument. In *Jones, supra*, Sea World, Inc., an operator of aquatic zoological parks, applied to NMFS for a permit to capture killer whales for purposes of scientific research and public display. After concluding that the completion of an EIS was not necessary, the NMFS issued a permit to Sea World with several conditions not present in the original application.

When various plaintiffs, including tour boat operators, environmental organizations and the state of Alaska, sued the government alleging that it had unlawfully failed to prepare an EIS addressing, *inter alia*, the arguable existence of uncertain environmental impacts resulting from the proposed whale captures, the NMFS argued that the conditions imposed on the permit mitigated any unknown environmental effects. The Ninth Circuit ruled as follows:

> We agree that conditions mitigating the environmental consequences of an action may justify an agency's decision not to prepare an environmental impact statement. *See [Steamboaters v. FERC*, 759 F.2d 1382, 1394 (9th Cir.1985) ]. The conditions contained in this permit, however, rather than mitigating environmental

consequences, generally operate simply to defer important agency decisions until more information has been obtained. At most, they "provide only general guidelines. Their effectiveness depends on how they are applied and enforced." *Id.* Moreover, the [NMFS], in issuing the permit, provided *no reasoned explanation* —indeed, no explanation at all—of how these conditions would prevent application of an exception to the categorical exclusions.

792 F.2d at 829. Likewise in this case, the court finds that, rather than squarely addressing any uncertainty regarding the impact of the proposed research as the law requires, the NMFS chose to defer consideration by imposing restrictions on the permit.

For the most part, the restrictions do not mitigate potential adverse impacts, but simply set forth procedures for collecting and assessing further information about those impacts. As in *Jones*, the effectiveness of the restrictions depends on how they are applied and enforced. For instance, Greenpeace pointed out in oral argument that, although the permit does provide that a NMFS observer can ride in Hoelzel's boat when he approaches the whales, the NMFS certainly does not have the funds to assign anyone to such a task on a continuous basis. Furthermore, the observer's ability to determine whether the whales are suffering adverse impacts would depend entirely on the extent of his or her knowledge of whale behavior in general and of the Puget Sound killer whales in particular.[7]

Third, Greenpeace argues that allowing Hoelzel's proposed research to proceed would set a precedent for future proposals involving invasive techniques. The court is not willing to conclude that the NMFS would fail to consider each future proposal

**7.** In connection with its argument about the uncertainty surrounding the proposed research, Greenpeace also challenges the government's failure to address questions raised about the necessity for the research and the validity of the scientific techniques to be used. For example, part of the reason for Hoelzel's proposed research was to study the killer whales' reproductive situation including the effect of pollutants on reproduction. But Dr. Howard Braham of the National Marine Mammal Laboratory in the NMFS stated in a memorandum reviewing Hoelzel's permit application that "[t]he consensus of scientists with expertise on killer whales indicates that there is not a reproductive problem with killer whales in Puget Sound." AR 56. The record also reflects the existence of questions about whether laboratory analysis of the samples collected would yield any useful results. *See, e.g.,* AR 55–56, 60.

on its individual merits. Nevertheless, there is some support for Greenpeace's position. The court notes by way of example the government's argument that an EA or EIS should not be required in this case because none has been completed concerning prior proposals to do dart biopsies on other types of whales and that there is nothing unique or different about Hoelzel's research proposal.

Fourth, Greenpeace contends that the proposed research may result in cumulatively significant impacts. As discussed above, the court finds merit in Greenpeace's position. There is evidence in support of the proposition that the killer whales may suffer cumulative adverse environmental impacts sufficient to give rise to a duty on the part of NMFS to prepare an EA or EIS under NEPA.

Greenpeace also argues that the NMFS violated the NEPA requirement to "study, develop and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," 42 U.S.C. § 4332(2)(E); that the NMFS violated the Administrative Procedure Act, 5 U.S.C. § 706, by failing to provide a reasoned explanation of its decision not to prepare an EA or to study, develop and describe the alternatives; and that the NMFS violated regulations promulgated under the MMPA, 50 C.F.R. § 216.31(c), by failing to engage in a reasoned consideration of whether the proposed taking would be consistent with the policies and purposes of the MMPA and whether the granting of the permit was required to further a bona fide and necessary or desirable scientific purpose.

Given its conclusion that the NMFS violated NEPA by failing to prepare an EA or EIS in light of the existence of factors which indicate that the proposed research does not qualify for a categorical exclusion, the court need not address these other issues. Nevertheless, the court will comment that neither the Decision Memorandum nor any other NMFS documents in the administrative record addresses in a reasoned way the questions which Greenpeace

raises. For instance, the NMFS did not study, develop or describe alternatives to the proposed research which would not involve the use of such controversial invasive methods of collecting data on the killer whale population of Puget Sound. *Compare National Audubon Society v. Hester,* 627 F.Supp. 1419, 1424 (D.D.C.1986).

For the above-stated reasons, plaintiff's motion for summary judgment is GRANTED and defendants' motion is DENIED.

IT IS SO ORDERED.

The Clerk of the Court is directed to send copies of this Order to counsel of record.