### The TOWNSHIP OF LOWER ALLOWAYS CREEK, Petitioner,

v.

### PUBLIC SERVICE ELECTRIC & GAS COMPANY, and the United States of America Nuclear Regulatory Commission, Respondents.

### No. 81–2335.

United States Court of Appeals, Third Circuit.

Argued June 9, 1982.
Decided Aug. 27, 1982.

Carl J. Valore (argued), Valore, McAllister, Westmoreland & Vesper, Northfield, N. J., for petitioner.

Mark J. Wetterhahn (argued), Robert M. Rader, Conner & Wetterhahn, Washington, D. C. (Richard Fryling, Jr., Newark, N. J., of counsel), for Public Service Electric & Gas Co.

Leonard Bickwit, Jr., Gen. Counsel, James A. Fitzgerald, Asst. Gen. Counsel, Peter R. Steenland, Jr., Chief, Appellate Section, Martha A. Torgow (argued), E. Leo Slaggie, U. S. Nuclear Regulatory Commission, Washington, D. C., Maria Iizuka, Lands & Natural Resources Div., Dept. of Justice, Washington, D. C., for Nuclear Regulatory Commission.

James E. Tierney, Atty. Gen., Rufus E. Brown, Deputy Atty. Gen., Philip Ahrens, Robert S. Frank, Asst. Attys. Gen., Augusta, Me., amicus curiae for the State of Maine.

Before ADAMS and WEIS, Circuit Judges, and CONABOY,* District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

We are asked on this appeal to decide whether the National Environmental Policy Act (NEPA) required the Nuclear Regulatory Commission ("NRC" or "Commission") to prepare an Environmental Impact Statement ("EIS") before permitting the licensee of a nuclear generating plant in Salem County, New Jersey, to store additional

---

* Honorable Richard P. Conaboy, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

quantities of spent fuel at the reactor site. The Township of Lower Alloways Creek ("Township"), the municipality near where the plant is located, intervenor in the proceedings below and petitioner here, contends that the Commission acted unlawfully and unreasonably when it determined that the proposed expansion would not "significantly affect[ ] the quality of the human environment," and that therefore the preparation of an EIS was unnecessary. After carefully reviewing the record before us, we conclude that, in this instance, the requirements of NEPA have been satisfied. Accordingly, the petition for review will be denied.

## I

### A

The controlled fission reaction that takes place within a light-water nuclear generator produces not only heat—which is converted to steam and employed to drive the plant's electricity-yielding turbines—but also radioactive fission byproducts, which accumulate over time and eventually impede the progress of the nuclear chain reaction. At the point when the build-up of fission byproducts threatens to undermine significantly the efficiency of the reaction, the fuel is removed from the reactor core and replaced. This discharged fuel is commonly referred to as "spent fuel." [1]

Spent fuel, which contains elements of uranium and plutonium, is highly toxic and must be isolated from the environment for thousands of years. As the Supreme Court has recognized, nuclear wastes " 'pose the most severe potential health hazard,' " *Vermont Yankee Nuclear Power Corp. v. Natu-*

ral Resources Defense Council, Inc., 435 U.S. 519, 539, 98 S.Ct. 1197, 1209, 55 L.Ed.2d 460 (1978) (quoting U.S. Atomic Energy Commission, *Radioactive Wastes* 12 (1965)). Proper disposal of spent fuel is essential if nuclear power is to be a safe and efficient form of energy production.[2]

When removed from the reactor core, spent fuel, in addition to being thermally very hot, is intensely radioactive. As a result, before it can be "handled"—*i.e.*, mechanically removed from the reactor site— the waste material must be cooled and shielded for at least 150 days. To accomplish this, spent fuel is transferred underwater from the reactor core, moved through a canal, and stored in what is known as a "spent fuel pool": an enormous, specially-designed, steel-reinforced concrete water basin. The used fuel cells are placed vertically in storage racks and surrounded by continuously circulating water; gradually, the fuel "cools," that is, it loses the major portion of its radioactivity. *See* U.S. Nuclear Regulatory Commission, *Generic Environmental Impact Statement on Handling and Storage of Spent Light Water Power Reactor Fuel* 202 (August 1979) (hereafter cited as *GEIS*).

Most nuclear power plants in the country, including the Salem I reactor at issue here, were designed to store, onsite and temporarily, only a modest amount of the waste byproducts they generate. For example, as originally devised, the spent fuel pool associated with Salem I had the capacity to store approximately four years of discharged fuel. It was expected that after this initial storage period, the spent fuel would be transferred to another location either for reprocessing [3] or permanent dis-

---

1. *See generally Westinghouse Elec. Corp. v. United States Nuclear Regulatory Comm'n*, 598 F.2d 759, 762 n.4 (3d Cir. 1979); *Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n*, 539 F.2d 824, 830–31 (2d Cir. 1976), *vacated and remanded to determine mootness*, 434 U.S. 1030, 98 S.Ct. 759, 54 L.Ed.2d 777 (1978).

2. The problems associated with the long-term storage of nuclear waste are not presented by this appeal. We note in passing that the District of Columbia Circuit recently invalidated a

series of NRC rules designed to measure the environmental effects associated with the "back end" of the uranium fuel cycle, *i.e.*, the reprocessing, storage, and disposal of spent fuel. *See Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Comm'n*, 685 F.2d 459, at 467–468 (D.C.Cir. 1982) (footnotes omitted).

3. Reprocessing involves the extraction of uranium and plutonium from spent fuel and their fabrication into new, mixed oxide nuclear fuel. While reprocessing holds the potential of re-

posal. In 1977, however, the NRC, in deference to President Carter's non-proliferation policy, indefinitely suspended the licensing of commercial reprocessing plants within the United States.[4] No facility has been or is soon to be designated a permanent waste depository, capable of receiving spent fuel from Salem I and other nuclear generators.[5] As a result of the unavailability of these two storage options, the operators of nuclear plants throughout the country were confronted with a dilemma: either their electrical generating activities had to be suspended indefinitely, or onsite storage capacity for nuclear wastes had to be increased. Not surprisingly, most licensee-operators preferred the latter alternative. This litigation, then, arises out of an attempt by one particular licensee—the Public Service Electric & Gas Company (PSE&G)—to amend its operating plan to allow for increased storage of spent fuel at one particular nuclear power plant—the Salem I facility.[6]

## B

The Salem Nuclear Generating Station consists of two mirror-image power plants—designated as Salem I and Salem II—located in southern New Jersey on an island in the Delaware River. The two light-water reactors function independently of each other, and this appeal involves only the status of the Salem I facility.[7]

After the necessary and detailed environmental and safety studies had been performed, the Salem I generator received its operating license in October 1976. As previously mentioned, the spent fuel pool associated with the reactor was originally designed to stock nuclear wastes that accumulated over approximately four years. In November 1977, PSE&G initiated proceedings to expand the onsite storage capacity

ducing the volume of nuclear wastes, as well as conserving uranium supplies, it is feared that the resulting isolation of plutonium could lead to increased nuclear proliferation or terrorism. *See Westinghouse Elec. Corp. v. United States Nuclear Regulatory Comm'n*, 598 F.2d 759, 762 -63 n.4 (3d Cir. 1979).

4. The Commission's decision to place a moratorium on the commercial reprocessing of spent fuel was upheld by this Court against a challenge brought by various businesses and organizations associated with the nuclear power industry. We found authority for the NRC's order in the Atomic Energy Act, and we concluded that the Commission had not violated the National Environmental Policy Act. *Westinghouse Elec. Corp. v. United States Nuclear Regulatory Comm'n*, 598 F.2d 759 (3d Cir. 1979).

5. There currently are two offsite independent spent fuel storage installations. One plant, however, no longer is accepting additional spent fuel for storage, and the other facility, operated by General Electric, will receive spent fuel shipments only pursuant to previous contracts. General Electric has no such commitment with respect to the Salem I generator. Various proposals for some type of national waste repository have been advanced, but such a facility does not appear likely to be established in the near future. *See Environmental Impact Appraisal by the Office of Nuclear Reactor Regulation Relating to the Modification of Spent Fuel Pools: Salem Nuclear Generating Stations, Unit 1* Appendix at 49a–51a (Jan. 15, 1979) (hereafter cited as *Salem I Environmental Impact Appraisal*).

6. In this section, we have attempted to frame the present controversy within the context of the larger national nuclear picture. As will become apparent, however, the decision in this case turns heavily on the particular facts associated with the Salem I reactor and the nature of the proceedings below.

7. At the time PSE&G petitioned for expansion of the spent fuel storage capacity of Salem I, the Salem II plant had not yet received its operating license. The utility, therefore, submitted its proposal for expansion of spent fuel storage at the Salem II site in the form of an amendment to its then-pending application for an operating license. The Unit 2 operating license was issued, with provision for increased storage of nuclear wastes, in May 1981. The time for judicial review of the Commission's issuance of the Salem II license appears to have expired. Inasmuch as the Township declined to participate in the Salem II licensing proceedings, *see Township of Lower Alloways Creek v. United States Nuclear Regulatory Comm'n*, 481 F.Supp. 443, 452–53 (D.N.J.1979), and because the final agency action under review here concerns only the Salem I spent fuel pool, *see* Public Serv. Elec. & Gas Co. (Salem Nuclear Generating Station, Unit I), ALAB–650, 14 N.R.C. 43 (1981), we will ignore those portions of the Township's brief which challenge the expanded storage capacity of the Salem II reactor.

of Salem I by filing a proposed amendment to its operating plan with the NRC. *See* 43 Fed.Reg. 5443 (1978). The amendment envisioned the redesign of the spent fuel pool in order to accommodate approximately four times as much (or about fifteen years' accumulation of) spent fuel. After the NRC prepared an Environmental Impact Appraisal report and held the appropriate hearings, discussed *infra*, the amendment was approved, and the expanded storage plan took effect, and remains in effect at present.

In order to clarify the underlying dispute in this case, it is instructive to examine more closely the precise design of the Salem I spent fuel pool. Nuclear waste is stored in what are referred to as fuel assemblies, each of which is approximately nine inches square and fourteen feet long. According to the original design for the Salem I pool, 264 fuel assemblies were to be stored in stainless steel open-frame racks. Under the new arrangement, however, the number of fuel assemblies was quadrupled, to 1170. Moreover, the amendment to the operating license also called for the replacement of the existing fuel storage devices with newly configured fuel storage racks. Under the previous plan, each of the fuel assemblies was approximately twenty-one inches apart. Under the new, more dense design, the center-to-center spacing between assemblies has been decreased to 10.5 inches.

When spent fuel is removed from the reactor core, it is still capable, if not properly shielded and cooled, of attaining "criticality," that is, of producing a self-sustaining fission reaction, resulting from the interchange of neutrons among the fuel assemblies. Spent fuel pools are designed to guard against this possibility. The spent fuel assemblies are immersed in water that has been treated with boric acid, which absorbs neutrons. Then, the entire procedure is carefully monitored, lest a defect in the valves or pumping system results in a substantial loss of the pool's contents. An additional factor in the previous Salem I pool design which mitigated against a possible self-generating reaction was that the fuel assemblies were separated by a distance sufficient to prevent excess neutron interaction. One consequence of adding 906 new fuel assemblies and placing each fuel assembly twice as close to its neighbors, however, is that criticality can no longer be prevented simply by reason of the distances between the assemblies. Thus, in the revised Salem I pool design, PSE&G has sought to prevent a spontaneous chain reaction by equipping the new, close-configuration storage racks with double-walled stainless steel cells filled with boral, a neutron absorbing substance. It is thought that the new assembly system will avert a self-sustaining reaction by inhibiting the travel of neutrons from one spent fuel assembly to another, inasmuch as any escaping neutron will be absorbed in the first instance by the boral within the cell walls, and in the second instance by the boric acid in the spent fuel pool itself.[8]

### C

Upon receipt of the PSE&G proposed amendment for increased onsite waste storage at Salem I, the NRC invited interested parties to seek leave to intervene and to request a public hearing. 43 Fed.Reg. 5443 (1978). In March 1978, the Township filed a petition to intervene and raised eleven objections to the proposed expansion. The Atomic Safety and Licensing Board[9] con-

---

**8.** Even spent fuel that has been "aged" retains the potential to achieve criticality, and of course there remain the long-term problems associated with the direct handling of radioactive material.

**9.** A brief outline of the administrative process followed by the NRC in this matter may be helpful. After PSE&G submitted the amend-

ment to its operating license pursuant to 10 C.F.R. §§ 2.100–.103 (1982), notice of a hearing was published in the Federal Register, as required by *id.* at § 2.104. That hearing was conducted by an Atomic Safety and Licensing Board, *see id.* at § 2.721, in accordance with the procedures set forth in *id.* at §§ 2.700–.759. An initial decision issued by a Licensing Board,

cluded that ten of the Township's contentions were either too underdeveloped or beyond the scope of its review.[10] The Licensing Board did accept for consideration, however, the Township's assertion that PSE&G "has not considered in sufficient detail possible alternatives to the proposed expansion of the spent fuel pool." At the time of the Licensing Board proceedings, the Township did not argue that the NRC was delinquent in not preparing an EIS to assess the effects of the proposed storage expansion at Salem I.

The Licensing Board held evidentiary hearings for nine days in 1979 and 1980. It considered not only the Township's challenge regarding the evaluation of alternatives to onsite spent fuel storage expansion, but also entertained two contentions presented by an additional intervenor and three questions raised by the Board itself.[11] After conducting the hearings, and after taking into account an Environmental Impact Assessment that had been prepared for the Salem I proposal, the Licensing Board granted PSE&G's application for an operating license amendment. *See Public Service Electric and Gas Co. (Salem Nuclear Generating Station, Unit 1)*, LBP–80–27, 12 N.R.C. 435 (1980). It concluded that the additional storage proposed by the amendment could be realized without endangering the health and safety of the public. *Id.* at

436, 457. More relevant for our purposes, the Board also found that the present fuel storage increase "will not significantly affect the quality of the human environment," and that therefore it was unnecessary under NEPA for the Commission to prepare an EIS. *Id.* at 456–57. The Township appealed the Licensing Board's decision to the Atomic Safety and Licensing Appeal Board, contending primarily that the Licensing Board erred in concluding that an EIS was unnecessary with respect to the Salem I reracking.

Like the Licensing Board, the Appeal Board concluded that the increased storage of radioactive wastes at the Salem I reactor site was not an activity significantly affecting the environment, and therefore did not trigger the full-scale environmental review process mandated by NEPA. The Appeal Board also determined that all alternatives to redesign of the spent fuel pool had been adequately considered by the Licensing Board prior to its decision to approve the operating amendment. In arriving at this result, the Appeal Board stressed the failure of the Township to present any evidence that might serve as a basis for undermining the reliability of the Environmental Impact Appraisal that had been prepared for the Salem expansion.[12] *See Public Serv. Elec. & Gas Co.*, 14 N.R.C. 43 (1981).

*see id.* at § 2.760, may be appealed to the Atomic Safety and Licensing Appeal Board, *see id.* at § 2.785, which ultimately issues a final decision. Any party dissatisfied with an Appeal Board decision may then petition for review by the Commission itself, which is vested with the discretionary authority to entertain or to reject such petitions, *see id.* at § 2.786. Procedures for judicial review of a final order of the NRC—be it an unreviewed Appeal Board decision or a ruling by the Commission itself—are discussed in the text *infra*.

10. The Township did not challenge the exclusion of these contentions either in its appeal to the Appeal Board or in its petition for review to this Court.

11. The two contentions raised by the additional intervenor (who did not join the Township's appeal to this Court) concern "the possible deterioration of the pool's rack structure and neutron absorption material ('boral') and the consequent implications for accidental criticali-

ty." Two of the three questions raised by the Appeal Board related to the accident at Three Mile Island; the final question had to do with the consequences of a gross loss of water from the spent fuel storage pool. *See* Public Serv. Elec. & Gas Co., *supra*, 14 N.R.C. at 47 n.3, 48 n.5.

12. In the words of the Appeal Board:
[The Township], in fact, affirmatively refused to litigate in this administrative proceeding the unspecified deficiencies it perceived in the [Environmental Impact Appraisal] (with the exception of its challenge to the adequacy of the consideration of alternatives). This was so despite the fact that the Commission's regulations clearly permit and encourage parties to challenge the admission and content of the staff's [Environmental Impact Appraisal] at [the] hearing. Yet [the Township] now boldly argues that it has been deprived of its procedural rights under NEPA. And, through this appeal, it inti-

The Township requested full Commission consideration of the Appeal Board decision. Pursuant to 10 C.F.R. § 2.786 (1982), however, the Commission unanimously declined to take review. Thereupon, the Township filed a petition for review with this Court, seeking reversal of the final NRC order entered by the Appeal Board. We have jurisdiction pursuant to 28 U.S.C. § 2342(4), a provision which makes reviewable in a court of appeals all final orders of the NRC issued in accordance with 42 U.S.C. § 2239.

## II

A single issue is raised by this appeal. The Township maintains that under NEPA, the NRC was obligated to prepare an Environmental Impact Statement before approving the expansion of the Salem I spent fuel pool. The Commission contends, however, that the decision to increase the amount of radioactive wastes stored at the Salem I site did not constitute a "significant" federal activity, and that therefore no EIS was required. In making its determination of no significant impact, the agency relied on an Environmental Impact Appraisal that had been prepared for the Salem I expansion, and concluded therefrom that the environmental consequences of the intended action were de minimis. We proceed to consider: a) the statutory and administrative framework of NEPA, including the differences between an EIS and an Environmental Impact Appraisal; b) the appropriate standard of review; and c) the

mates that it is finally ready to litigate still largely unidentified and unparticularized deficiencies it sees in the [Environmental Impact Appraisal] and seeks to overturn the Licensing Board's thorough, well-reasoned decision.

\*      \*      \*      \*      \*      \*

In our view, the Licensing Board's conclusion that approval of the Salem spent fuel pool expansion is not a major action significantly affecting the environment is fully consistent with the record. The intervenors had every opportunity to demonstrate otherwise but failed to do so.

Public Serv. Elec. & Gas Co., 14 N.R.C. at 67–68 (citations omitted).

13. NEPA requires only that an agency "*consider*[ ] the environmental consequences" of its decisions. *Strycker's Bay Neighborhood Coun-*

burden to be met by intervenors in a dispute such as that involved here.

### A

The National Environmental Policy Act, enacted in 1969, imposes "essentially procedural" duties, *Vermont Yankee*, 435 U.S. at 558, 98 S.Ct. at 1219 (1978), upon administrative agencies considering actions that have the potential for affecting the environment. 42 U.S.C. § 4332. As the Supreme Court recently observed, NEPA is intended to serve two main objectives. The dominant "thrust" of the Act is to ensure "that environmental concerns [are] integrated into the very process of agency decisionmaking." *Andrus v. Sierra Club*, 442 U.S. 347, 350, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979). Additionally, the various procedures mandated by the statute are intended "to inform the public that the agency has considered environmental concerns in its decisionmaking process." *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, 454 U.S. 139, 142–143, 102 S.Ct. 197, 201, 70 L.Ed.2d 298 (1981).[13]

This appeal involves the foremost of NEPA's "essentially procedural" provisions, namely, the requirement that an agency prepare an Environmental Impact Statement whenever a proposed "major Federal action" will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C).[14] The key word in this

*cil, Inc. v. Karlen*, 444 U.S. 223, 228, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (emphasis added). Thus, for example, an EIS, once prepared, does not dictate any substantive outcome; the statement is intended to make decisionmakers aware of the potential environmental ramifications of their actions, but not to determine their ultimate judgments. *See Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976).

14. Wholly apart from the requirement to prepare an EIS with respect to "significant" federal actions, NEPA also places on agencies the responsibility to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The courts have interpreted this additional stat-

statutory phrase, of course, is "significant".[15] For guidance in its interpretation, we look to NEPA-implementing guidelines promulgated by the Council on Environmental Quality (CEQ) and adopted by the NRC.[16] These regulations—which are entitled to "substantial deference," *see Andrus v. Sierra Club, supra,* 442 U.S. at 356–58, 99 S.Ct. at 2340–2341—direct that in determining whether a particular activity will give rise to "significant" effects on the environment, an agency take into account considerations of "context" and "intensity". That is, both the short- and long-term consequences for society as a whole, the relevant region, the locality, and any affected interests must be assessed; and those consequences are to be evaluated with respect to a host of factors, including, among other things, the degree to which the proposed action affects public health or safety, the unique geographical characteristics of the surrounding area, the potential for controversy, the possibility of unique or unknown risks, and the action's effect on endangered species. *See* 40 C.F.R. § 1508.27 (1981). The regulations make clear, then, that an agency must undertake a comprehensive assessment of the expected effects of a proposed action before it can determine whether that action is "significant" for NEPA purposes. In practice, this pre-EIS analysis takes the form of an Environmental Impact Appraisal.[17] If, after reviewing such an appraisal, an agency determines that its proposed action will have no significant effects upon the environment, the agency issues a "negative declaration" and no further studies are necessary. If, however, it is clear that the human environment will be "significantly" affected, then a full-scale EIS is mandatory.[18]

utory provision quite broadly, holding that an agency is required to "study, develop, and describe" alternatives not only when considering "significant" actions, but whenever "the objective of a major federal [action] can be achieved in one of two or more ways that will have differing impacts on the environment." *Trinity Episcopal School Corp. v. Romney,* 523 F.2d 88, 93 (2d Cir. 1975); *see City of New York v. United States Dept. of Transp.,* 539 F.Supp. 1237, 1276–77 (S.D.N.Y.1982) (citing cases).

Although the Township contends that the NRC paid inadequate attention to alternatives to the Salem I reracking proposal, *see* text *infra,* it does not cite or rely upon § 4332(2)(E). Giving the Township the benefit of the doubt as to whether this matter was raised, however, we believe that the Commission has satisfied any additional requirements imposed on it by § 4332(2)(E). Both the Environmental Impact Appraisal prepared in this matter and the relevant decisions of the Licensing Board and the Appeal Board carefully evaluated the merits and demerits of more than a half dozen suggested alternatives to the Salem I reracking proposal. *See Salem I Environmental Impact Appraisal, supra* note 5, Appendix at 47–55; Public Serv. Elec. & Gas Co., 12 N.R.C. at 443–48 (Licensing Board); Public Serv. Elec. & Gas Co., 14 N.R.C. at 64–65 (Appeal Board).

**15.** In this Circuit, before the EIS requirement contained in NEPA is triggered, it must be established not only that a proposed federal action is "significant," but also that it is "major." *See NAACP v. Medical Center, Inc.,* 584 F.2d 619, 626–27 (3d Cir. 1978). No party to this appeal, however, contends that the reracking of the Salem I spent fuel pool does not constitute a "major" federal action.

**16.** The CEQ guidelines are not binding on an agency that has not expressly adopted them. *See Hiram Clarke Civic Club, Inc. v. Lynn,* 476 F.2d 421, 424 (5th Cir. 1973) (CEQ regulations are "merely advisory"); *but cf. Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979) ("CEQ's interpretation of NEPA is entitled to substantial deference"). The NRC, however, has explicitly adopted the CEQ guidelines and promulgated them in the form of administrative regulations. *See* 10 C.F.R. §§ 51-1–.20 (1982). Although the regulations took effect after the events relating to Salem I herein described, the Commission has contended at all times that it acted in accord with the CEQ guidelines, and on appeal here does not contest the applicability of its regulations.

**17.** Federal agencies prepare approximately 30,-000 Environmental Impact Appraisals annually, but only some 1000 Environmental Impact Statements. U.S. Council on Environmental Quality, *Environmental Quality—1976* at 123, 132. Thus,. "[a]s a screening device, the environmental assessment allows agencies with limited resources to focus on truly important federal actions." *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 858 (9th Cir. 1982).

**18.** *See* 40 C.F.R. §§ 1501.3, 1501.4, 1508.9 & 1508.13 (1981). NRC regulations direct that an environmental statement be prepared prior to the taking of any of a number of specified actions, including the construction of a nuclear

In practical terms, the difference between an Environmental Impact Appraisal and an EIS is considerable. An Environmental Impact Appraisal is a "concise" and "brief" statement discussing whether an EIS is necessary and evaluating the environmental impacts and alternatives of a proposal.[19] By contrast, an EIS is an elaborate document which, according to the Act, must be "detailed." An EIS must include a discussion of not only the expected environmental impact of the proposed action, any adverse environmental effects, and any alternatives to the proposed action, but also more "cosmic" considerations. These considerations include the relationship between short-term and long-term uses of the environment; any irreversible and irretrievable commitments of resources that would follow upon implementation of the proposal; the effects on surrounding cultural, historical, and ecological resources; the degree to which the project might be "controversial"; the extent to which the project might impose "uncertain or unknown risks" upon the environment; whether the action might establish a precedent for future actions; and the degree to which the project, while insignificant in itself, might be significant when considered in connection with other similar actions.[20] In preparing an EIS, moreover, federal administrators are directed to consult with state and local officials, members of the public, and experts from other federal agencies. 42 U.S.C. § 4332(2)(C).

At the administrative proceedings below, the NRC relied upon a twenty-seven page Environmental Impact Appraisal that had been prepared for the proposed expansion of the storage capacity of the spent fuel pool at the Salem I reactor site. That appraisal described the proposed action and its expected environmental consequences, evaluated alternatives to the proposal, and concluded that because the planned activity was not "significant" for NEPA purposes, "an environmental impact statement need not be prepared." *See Salem I Environmental Impact Appraisal, supra* note 5. The Township argues that a finding of no-significant-impact is inconsistent with the record compiled in this case. It contends that in refusing to move forward with the preparation of an EIS, the Commission in effect "short-circuited" the environmental review process mandated by NEPA.

**B**

An agency cannot, of course, avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect upon the environment.[21] Courts are obligated to review the administrative record to determine whether an "agency has supplied convincing reasons why potential impacts are truly insignificant," if such is

---

power plant, its licensing and operation, and the issuance of a license to possess or reprocess nuclear wastes. 10 C.F.R. § 51.5(a) (1982). Other specified actions ordinarily do not require preparation of an EIS. *Id.* at § 51.5(d). The expansion of the storage capacity of a spent fuel pool is not among the actions specified on either list. Accordingly, such a proposal "may or may not" trigger the EIS requirement, "depending upon the circumstances." *Id.* at § 51.5(b).

**19.** *See* 40 C.F.R. § 1508.9 (1981). The relevant NRC regulation provides:
(b) *Environmental impact appraisals.* An environmental impact appraisal will include: (1) A description of the proposed action; (2) A summary description of the probable impacts of the proposed action on the environment; and (3) The basis for the conclusion that no environmental impact statement need be prepared.

10 C.F.R. § 51.7(b) (1982).

**20.** *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.27 (1981). In addition, if a recent decision of the Court of Appeals for the District of Columbia is to be followed, under some circumstances it may be necessary for an agency in preparing an EIS to take into account both the psychological harm to neighborhood residents and the economic and social deterioration in nearby communities resulting from a federal project. *See People Against Nuclear Energy v. United States Nuclear Regulatory Comm'n,* 678 F.2d 222 (D.C.Cir.1982).

**21.** "The spirit of [NEPA] would die aborning if a facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review." *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 466 (5th Cir. 1973).

the agency's recommendation. *Maryland-National Capital Park and Planning Commission v. United States Postal Service*, 487 F.2d 1029, 1040 (D.C.Cir.1973).[22]

It is an open question in this Circuit, however, precisely what standard of review should be applied in conducting this judicial examination. In *Concord Township, Delaware County, Commonwealth of Pennsylvania v. United States*, 625 F.2d 1068 (3d Cir. 1980), we noted that the federal courts of appeals have differed as to whether an administrative decision not to prepare an EIS should be measured by the "reasonableness" of that decision under the circumstances, or by the traditional "arbitrary and capricious" standard contained in the Administrative Procedure Act. *Id.* at 1073 & nn.9, 11.[23] Judge Gibbons, writing for the Court, found it unnecessary for this Circuit to join either group of opposing appellate courts. Instead, without deciding whether it was in fact the appropriate judicial standard, he proceeded to apply the "reasonableness" test to the facts of the case for three reasons: first, because that test appeared to be preferred by the district courts under our supervision; second, because there was "much to be said in favor of subjecting these threshold determinations to the higher scrutiny on review," and finally, because the particular agency decision under consideration "pass[ed] muster" even under the "higher" measure of "reasonableness." *Id.* at 1073–74.

We believe it not inappropriate to proceed in this appeal along the same lines as did the Court in *Concord Township*. That is, we will assume, without deciding, that an agency's determination not to prepare an EIS must be "reasonable under the circumstances," *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1320 (8th Cir. 1974), when viewed "in the light of the mandatory requirements and high standards set by [NEPA]," *Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1249 (10th Cir. 1973). Applying this standard, we shall "proceed to examine and weigh the evidence of both the plaintiff and the agency to determine whether the agency reasonably concluded that the particular project would have no effects which would significantly degrade our environmental quality." *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir. 1973).

Before applying the "reasonableness" standard to the administrative record compiled for the Salem I reracking proposal, however, we address one further matter. Ultimately, even under the "reasonableness" standard of review, "[t]o upset an agency determination not to prepare an impact statement ... *will require a showing that the project could [in fact] significantly affect the quality of the human environment.*" *Minnesota Public Interest Research Group, supra*, 498 F.2d at 1320.[24] It is to

---

**22.** Judge Leventhal identified three relevant inquiries in this regard:

First, did the agency take a "hard look" at the problem, as opposed to bald conclusions, unaided by preliminary investigation? ... Second, did the agency identify the relevant areas of environmental concern? ... Third, as to problems studied and identified, does the agency make a convincing case that the impact is insignificant?

*Maryland-Nat'l Capital Park and Planning Comm'n v. United States Postal Serv.*, 487 F.2d 1029, 1040 (D.C.Cir.1973).

**23.** It is generally thought that the "reasonableness" standard of review is "far less deferential" to agency decisionmaking than is the "arbitrary and capricious" standard. *See Concord Township, Del. County, Commonwealth of Pa. v. United States*, 625 F.2d 1068, 1073 (3d Cir. 1980). In some instances, however, the distinction between the two standards tends to blur.

Even under the arguably "lower" standard, agencies are not entitled to unbridled discretion in determining whether preparation of an EIS is necessary. *See, e.g., City of New York v. United States Dep't of Transp.*, 539 F.Supp. 1237, 1261–76 (S.D.N.Y.1982) (agency's finding that transportation of nuclear waste material through New York City would produce no significant environmental effects was "arbitrary, capricious, and an abuse of discretion," because the agency had paid insufficient attention to risks deriving from human error, sabotage, and mechanical failure, had inadequately assessed the physical and social consequences accompanying a catastrophic accident, and had failed to explore alternatives to highway transportation).

**24.** "Courts that have faced the problem [of allocation of the burden of proof in negative declaration controversies] place the initial bur-

this issue—*viz*, the nature of the showing required of an intervenor in a case such as the present—that we now turn.

## C

■ In *Vermont Yankee, supra*, the Supreme Court defined the proper role for intervenors who wish to participate in NEPA-related administrative proceedings. A unanimous Court stressed that

while it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.

435 U.S. at 553, 98 S.Ct. at 1216. The Court then defined the threshold showing that an, intervenor must make to require agency consideration of its views: " '[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made ...; it must show why the mistake was of possible significance in the results.' " *Id.* (quoting *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 394 (D.C.Cir.1973), *cert. denied sub nom. Portland Cement Corp. v. Administrator, EPA*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)). The Justices concluded with an observation regarding the advancement of "obscure" criticisms by intervenors:

[A]dministrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the

ground that the agency failed to consider matters "forcefully presented."

435 U.S. at 553–54, 98 S.Ct. at 1216–1217.

We believe that the admonitions of the Supreme Court concerning the responsibilities of intervenors in the administrative process apply with equal force with respect to judicial proceedings. That is, paraphrasing *Vermont Yankee*, we believe it is "incumbent upon [petitioners] who wish to [appeal a NEPA-related agency determination] to structure their participation so that it is meaningful, so that it alerts the [court] to the [petitioners'] position and contentions." 435 U.S. at 553, 98 S.Ct. at 1216. Judges are neither scientists nor technicians; if judicial review of agency decisionmaking is to be productive and profitable, courts must insist that litigants provide them with sufficient information and analysis to assess critically the validity of the allegedly improper agency action. In this regard, for courts no less than for administrative bodies, "cryptic and obscure reference[s]" are unwelcome, and the failure to demonstrate why a supposed mistake "was of possible significance in the results" is unhelpful.

■ Abstracting from these general statements to the controversy *sub judice*, we believe the petitioner is obligated to demonstrate specifically how and why the Commission's finding of "no significant impact" was somehow erroneous or unreasonable. As will become apparent, it is the failure of the Township to satisfy this burden that ultimately proves fatal to its cause.

## III

Before considering the Township's specific contentions, it is necessary to review, albeit in a summary fashion, the environmental studies relied upon by the NRC in making its "no significant impact" determination. Such a discussion will serve to highlight the considerable attention given by the Commission to the environmental ramifications of the Salem I project.

den of demonstrating the existence of 'substantial environmental issues' on the plaintiff. The plaintiff's obligation is satisfied if a deficiency

in the administrative record can be established." *Pokorny v. Costle*, 464 F.Supp. 1273, 1276 (D.Neb.1979) (citations omitted).

The environmental review prepared for the redesign of the Salem I spent fuel pool actually was compiled in two stages. Initially, the staff completed an Environmental Impact Appraisal, which assessed the expected effects of the proposed expansion of the nuclear waste storage facilities at the Salem I site. A number of objections to this preliminary appraisal were raised by the intervenors, however. Subsequently, therefore, the Licensing Board issued a written opinion which, in effect, supplemented the agency's Environmental Impact Appraisal and responded to the intervenors' demurrals.

*Environmental Impact Appraisal.* The Environmental Impact Appraisal prepared by the NRC staff concentrated primarily on the expected environmental impacts of the proposed action and any available alternatives. *See Salem I Environmental Impact Appraisal, supra* note 5, Appendix at 35a–62a. With respect to the impacts associated with expansion of the storage capacity of the Salem I spent fuel pool, the appraisal noted that there would be no additional land or water use, inasmuch as the size of the spent fuel pool would remain unchanged. The appraisal focused instead on the fact that the planned expansion called for a sizeable increase in the amount of nuclear waste to be stored in the pool. The analysis was premised on the assumption that the only change resulting from the proposed amendment would be the additional storage of fuel more than four years old.[25] The Environmental Impact Appraisal concluded that no significant environmental

effect would follow from the storage of this "older" spent fuel, inasmuch as "[t]he longer the fuel assemblies decay, the less radioactivity they contain"; therefore, little *incremental* danger would be associated with the accumulation of spent fuel more than four years old. *Id.* at 40a–47a.[26]

The Environmental Impact Appraisal then addressed, and dismissed, a number of potential alternatives to increasing the storage capacity of the Salem I spent fuel pool. First, the report rejected the possibility of reprocessing the spent fuel, given that President Carter had terminated reprocessing arrangements in the United States, *see* pp. 735–736 & n.4 *supra*. Second, for reasons previously mentioned, *see* pp. 735–736 & n.5 *supra*, the appraisal discounted the possibility of storing nuclear waste at independent spent fuel storage installations. Third, the intervenors' suggestion that Salem I wastes be stored at the Salem II nuclear plant, which had not yet opened, was rejected because the Salem II spent fuel pool had no larger storage capacity than that which accompanied Salem I. Transferring the wastes to Salem II, therefore, would in no way alleviate perceived long-term storage problems. Fourth, and for similar reasons, the study dismissed as infeasible efforts to store Salem I spent fuel at other nuclear reactor sites. Fifth, the appraisal rejected a proposal to operate the Salem I plant on a "part time" basis until arrangements could be made at the national level to provide for the storage of nuclear wastes. Not only would such a course of action prove inefficient and costly, it would "result[ ] in no

---

25. The agency noted that under the original design, the Salem pool would accommodate four years worth of spent fuel; under the revised configuration, as much as 15 years of nuclear wastes could be stored; therefore, the difference between the two plans was that under the new arrangement, four to 15 year old spent fuel would be located at the Salem I facility instead of being shipped off site. This analysis was faulty, however, inasmuch as no attention was paid to the fact that under the new design, all of the spent fuel assemblies were located in greater proximity to each other. The analytical shortcoming was rectified by the Licensing Board, though, as discussed in the text *infra*.

26. The appraisal explored—and discounted—the possibility that small leaks could develop in fuel assemblies stored under water for a period of up to 15 years, noting that there had been no significant leakage from reactor fuel stored over a sizeable period of time at other sites in the country. Additionally, the appraisal concluded that there would be little significant impact relating to the release of radioactive gas, the contamination of surrounding waters, or occupational exposure. *Salem I Environmental Impact Appraisal, supra* note 5, Appendix at 40a–47a.

benefits because the amount of fuel discharged to the [spent fuel pool] over the long run is not decreased." Finally, the study rejected out of hand, as unwarranted under the circumstances, the intervenors' request that the Salem I generator be shut down altogether pending resolution of the nuclear waste question. *Salem I Environmental Impact Appraisal, supra* note 5, Appendix at 47a–55a.

In sum, because there were no significant environmental consequences resulting from the proposed action, and because none of the suggested alternatives appeared to be either more feasible or more environmentally desirable, the Environmental Impact Appraisal concluded that the preparation of an EIS for the Salem I project was unnecessary.[27]

*Licensing Board Decision.* After conducting public hearings and after entertaining statements and evidence submitted by interested parties, the Licensing Board issued a written decision which, in effect, supplemented the Environmental Impact Appraisal by addressing a number of addi-

tional factors. *See Public Service Electric and Gas Co., supra,* 12 N.R.C. at 435–58. First, the Board considered the intervenors' complaint that the new storage rack arrangement, calling for the fuel assemblies to be located closer to each other, would increase the likelihood of the spent fuel attaining criticality. Relying primarily on NRC staff testimony regarding privately conducted studies, however, the Board determined that the rack structure proposed for Salem I "compare[s] favorably with [that] for other spent fuel pools."[28] Second, the Licensing Board considered and discounted the likelihood of a number of potential defects in the new stainless-steel fuel assembly containers.[29] Third, the Board evaluated the impact of the Three Mile Island (TMI) accident. Despite the severity of that accident, the spent fuel pool at TMI was unaffected. Thus, the Board concluded that if a TMI-type accident were to occur at Salem I, there would be "little, if any effect on the spent fuel pool as now authorized, and little, if any effect on the

---

**27.** In its *GEIS* report on spent fuel storage, *see* p. 4 *supra,* the Commission directed that with respect to each proposed waste storage expansion, five specific factors be "applied, balanced, and weighed." Accordingly, the Environmental Impact Appraisal prepared for the Salem I expansion concluded that: a) the proposed expansion would have a benefit independent of similar licensing actions designed to ameliorate the shortage of spent fuel capacity; b) the action would not constitute a commitment of resources tending to foreclose alternatives available with respect to other similar licensing proposals; c) the environmental impacts associated with the Salem I action could be adequately addressed within the context of the pending applications; d) all technical issues that arose during review of the Salem I proposal had been resolved; and e) a deferral of the proposed licensing action would result in substantial harm to the public interest. *Salem I Environmental Impact Appraisal, supra* note 5, Appendix at 57a–61a.

**28.** *Public Service Electric and Gas Co., supra,* 12 N.R.C. at 439. Criticality is attained when the ratio of the number of neutrons produced from fission in each generation to the number of neutrons produced in the preceding generation equals 1.0. NRC regulations specify that the maximum acceptable level permitted for spent fuel pools is 0.95. Unrebutted evidence introduced during the proceedings below indi-

cate that the criticality factor for the redesigned Salem I plant is less than 0.90, even without allowing for the presence of boron in the spent pool water.

**29.** First, the Licensing Board evaluated the suggestion that the new storage racks would deteriorate. Crediting the testimony of NRC staff officials, however, the Board concluded that the corrosion rates associated with the stainless-steel spent fuel containers were "too low to measure." Second, based on much the same scientific testimony, the Board determined that there was little danger that the boral lining within the cells would corrode when (and if) exposed to the spent fuel water. Finally, the Board evaluated the possibility that as the spent fuel aged and water leaked into the cell walls, the walls might expand as hydrogen gas accumulated within them. While recognizing that such swelling was a distinct possibility, the Board concluded that the resulting pressure would not rupture the cells, and that no safety problems were associated therewith. With respect to each of these matters, "[n]o direct testimony was introduced by the intervenors to refute any of the evidence, interpretations, or conclusions presented by [PSE&G or the NRC staff]." *See Public Serv. Elec. & Gas Co., supra,* 12 N.R.C. at 439–43.

pool with the expanded storage capacity requested by the utility." *Id.* at 448–51.

Finally, the Board entertained testimony relating to the probable consequences of a "gross loss of water" accident at Salem I, *i.e.*, an accident leading to the draining of the water in the spent fuel pool. According to the Board, the intervenors could not adequately describe a mechanism by which a water loss might result in the escape of a large amount of radioactivity from the pool. Although NRC staff experts admitted that because of the decrease in natural convection resulting from the new storage configuration, there was a "higher likelihood" that recently discharged spent fuel would reach oxidation temperatures following a massive water loss in the pool, they stressed that such a gross loss of water was in itself an event of very low probability. Moreover, as the Board noted, nothing in the Township's presentation was responsive to the question whether "the total risk presented by the fuel pool would substantially increase because of the proposed expansion." *Id.* at 452–53. According to staff testimony that the Licensing Board labeled "cogent and well founded," however, even if one assumed (a) a gross water loss in the pool, leading to (b) the oxidation of recently discharged spent fuel, and ultimately resulting in (c) the oxidation of the "older" spent fuel, "any oxidation of these older assemblies would be limited, and would not lead to a release of fission products substantially greater than those released by the recently discharged fuel." *Id.* at 454. On the basis of this unrebutted testimony, the Board reasoned that "even if

oxidation did propagate to the older fuel the resulting radioactive release would not be significant in comparison to the radioactive release from the recently discharged fuel." *Id.* at 455.

The Licensing Board concluded, therefore—as had the Environmental Impact Appraisal—that no significant environmental effects would accompany the incremental increase on the amount of nuclear wastes stored at Salem I.[30] It is this conclusion that the Township asks us to overturn on appeal.

## IV

■ We proceed to review the Township's assertion that the NRC was obligated under NEPA to prepare an EIS to accompany the Salem I reracking project. In evaluating the merits of this position, it is important to recognize that there are a number of conceivable attacks that the Township does *not* make. The Township does not contend, for example, that the Commission, *on the basis of the record before it,* arrived at the wrong result with respect to the "significance" question. Similarly, the Township does not identify any deficiencies in the analysis contained in the Environmental Impact Appraisal or the findings of the Licensing Board or the Appeal Board. Nor does the petitioner point to any evidence in the record proffered by it or anyone else demonstrating that significant environmental effects will accompany the incremental spent fuel storage increase at Salem I.[31]

---

**30.** As mentioned previously, the decision of the Licensing Board was affirmed in all respects by the Appeal Board. *See Public Serv. Elec. & Gas Co., supra,* 14 N.R.C. at 43–70.

**31.** The petitioner complains that the Licensing Board improperly excluded the testimony of Dr. George Luchak, who warned of the dangers associated with the accumulation of large amounts of nuclear wastes in close proximity to a nuclear reactor. *See* Reply Brief for Petitioner at 3–4. The Licensing Board, however, found Dr. Luchak "not qualified" to testify about the probability or consequences of a serious accident involving the Salem I spent fuel pool. On this appeal, the Township presents

no evidence that might lead us to overturn this conclusion. For that matter, the Township appears not even to have objected during the proceedings below to the striking of Dr. Luchak's testimony. *See Public Serv. Elec. & Gas Co., supra,* 14 N.R.C. at 62. Nonetheless, we have reviewed the disputed testimony, and find it to be conclusory and ill-supported. Even were we to assume that the Township's witness was properly qualified to testify about this matter, we would not be inclined to conclude from his statement alone that "significant" environmental consequences were associated with the Salem I spent fuel pool expansion.

Instead, the Township's attack on the adequacy of the environmental review conducted by the NRC is broad-sweeping: in effect, the petitioner asserts that something inherent in the very nature of the proposed action—the near-quadrupling of nuclear waste storage at a reactor site—entails a significant impact on the human environment, thereby necessitating the preparation of an EIS. In this regard, the Township maintains that "[t]o a layman, it seems rather obvious that increasing spent fuel storage of fuel assemblies by a factor of four or five times is a major federal action having potential significant effect on the human environment." Brief for Petitioner at 43–44. Similarly, the petitioner asks us to "make [our] own determination," wholly "apart from any agency determination," that the "storing of radioactive spent fuel assemblies . . . at two nuclear power plants on an Artificial Island in the Delaware River is [a] major federal action significantly affecting the quality of the human environment." *Id.* at 41.

We find this self-styled "common sense" argument unacceptable, however. As our discussion of NEPA and its interpretive caselaw has made clear, the burden is on a petitioner to establish that a particular decision not to require an EIS constitutes a violation of NEPA. *See Peshlakai v. Duncan*, 476 F.Supp. 1247, 1252 (D.D.C.1979) (citing cases). This responsibility, we believe, cannot be discharged merely by baldly asserting, without supporting proof or evidence, that significant effects *will* accompany a proposed action—particularly when such an assertion is made without even addressing or confronting the detailed and comprehensive analyses and studies compiled by the agency which arrive at the contrary conclusion. *Vermont Yankee*

would appear to require—not only of intervenors before a federal agency, but also of petitioners before this Court—that at least some effort be made to advance specific allegations tending to indicate that the agency somehow misapplied the law, misinterpreted the evidence, overlooked certain testimony, or unreasonably reached its "no significant impact" determination. Considering the Township's utter lack of evidentiary underpinning in support of its declaration that the Salem I expansion is "significant" for NEPA purposes, and in view of the apparently adequate environmental review conducted by the NRC in this instance, we cannot say that the Commission erred or acted unreasonably in approving PSE&G's licensing amendment without first ordering the production of an EIS.

Our conclusion in this respect, we emphasize is based on the particular facts involving the Salem I reactor and the nature of the showing (or, more precisely, the lack of showing) made by the Township on this appeal. Given that the Township has not raised individualized challenges to the underlying determinations made by the NRC, we simply need not decide more general questions, such as whether the prospect of a gross loss of water is improbable, whether the new stainless steel cells will deteriorate over time, or whether there in fact are no significant incremental effects associated with the storage of "older" spent fuel at a nuclear reactor site. Our holding, therefore, is explicitly intended to leave open the possibility that, in some future case, evidence could be presented such that a court might deem the reracking of a spent fuel pool "significant" for NEPA purposes.[32] A different record composed by different parties concerning a different proposal for a different facility may indeed produce a different result.

---

**32.** The State of Maine, amicus curiae in this appeal, informs us that in similar proceedings before the Commission involving the expansion of nuclear waste storage at the Maine Yankee nuclear reactor, it will introduce evidence indicating that: a) the storage of additional spent fuel will increase the environmental hazards resulting from a gross loss of water in the spent fuel tank; b) the concededly increased probability of a radiation release in the event of a

loss of coolant alone is a "significant" impact triggering NEPA; c) the Commission has neglected to consider the problems associated with the long-term storage of nuclear wastes, *see State of Minn. v. United States Nuclear Regulatory Comm'n*, 602 F.2d 412 (D.C.Cir. 1979); and d) the Commission has not adequately considered the methods and techniques for limiting the amount of spent fuel generated.

■ In addition to its primary contention—that an EIS should be prepared for the Salem I expansion as a matter of "common sense"—the Township advances three other arguments. First, the petitioner asserts that an EIS is necessary because the Salem I plant is located in the "sensitive coastal wetlands" of New Jersey. Nothing in the record, however, indicates that the Salem I site is particularly "sensitive." Moreover, it is an open question whether that fact alone, assuming its truth, would be sufficient to trigger the EIS requirement: after all, were a court to adopt the Township's line of reasoning concerning the "sensitiveness" of the coastal region, absolutely no action ever could be taken at Salem I without an EIS being prepared.

■ Second, the Township objects to what it views as an NRC policy of refusing to prepare Environmental Impact Statements whenever an increase in the waste storage capacity of a spent fuel pool is proposed. The Township maintains that in the more than two dozen instances to date where a utility has attempted to expand its spent fuel pool to accommodate more waste, the NRC has determined that a full-scale EIS was unnecessary. Instead, according to the petitioner, the Commission has relied upon *GEIS*, a "generic" statement on the onsite storage of spent fuel, as a substitute for the more detailed, case-by-case evaluation that would be necessary were an EIS ordered. We need not accept PSE&G's rebuttal—that the Commission has never ordered the preparation of an EIS for a spent fuel reracking proposal because such actions are "so routine and so environmentally insignificant," Brief for Respondent PSE&G at 25—in order to reject the Township's contention in this regard. In our view, the presence or absence of an unofficial NRC "policy" of systematically skirting the requirements of NEPA [33] has little to do with the ultimate legal question posed by this appeal: whether it can be said on the basis of the administrative record compiled below that the agency acted unreasonably in refusing to prepare an EIS for the Salem I expansion proposal. A court cannot disturb what in this instance amounts to unchallenged agency findings and conclusions solely on the basis of unsupported intimations having to do with the agency's behavior in other situations.[34] As for *GEIS*, it is clear that the NRC cannot use that document as a proxy for the more individualized consideration of a particular expansion proposal that NEPA would appear to require [35] —and it is also clear that the NRC has not attempted to do so here.[36]

Finally, the Township insists that in approving the PSE&G license amendment application, the Commission gave inadequate consideration to alternatives to the proposed action. *See* Brief for Petitioner at 21–22. In view of the considerable attention devoted to a comparison of all prof-

---

**33.** The Commission denies that it has such a policy. It notes that, just as was the case for the Salem I proposal, for other spent fuel pool expansions negative declarations were issued only after comprehensive Environmental Impact Appraisals had been prepared. Thus, according to the Commission, "[t]hat [spent fuel pool] expansions have proved to be environmentally insignificant is a conclusion of fact, not policy." Brief for Respondent NRC at 40.

**34.** For similar reasons, the general criticisms of the NRC's treatment of the spent fuel pool expansion issue leveled by the Environmental Protection Agency at the time of the *GEIS* report and relied upon by the Township here cannot compensate for the petitioner's failure to demonstrate that "significant" environmental effects will follow from the adoption of the Salem I reracking proposal. For that matter, the EPA was *not* a party to the present pro-

ceedings and, insofar as we have been able to determine, has taken no position with respect to the Salem I project.

**35.** Indeed, the *GEIS* study itself concluded that "[b]ecause there are many variations in storage pool designs and limitations caused by spent fuel already in some pools, the licensing reviews must be done on a case-by-case basis." *GEIS*, Appendix at 401.

**36.** The *GEIS* report was issued well after the Environmental Impact Appraisal for the Salem I proposal was completed in January 1979; the study never was made part of the record in the Salem I proceedings; and both the Licensing Board and the Appeal Board reached their "no significant impact" conclusions on the basis of the record, and not *GEIS*.

fered alternatives to the Salem I reracking proposal in the Environmental Impact Appraisal, *see* pages 743–744 *supra*, we believe this assertion on the part of the Township to be without merit. *See also* note 14 *supra*.

## V

For the foregoing reasons, the petition for review will be denied.