**THE STEAMBOATERS, an Oregon non-profit corporation, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY, COMMISSION, Kenneth Plumb, Secretary of FERC, Winchester Water Control District, and Elektra Power Corporation, Respondents,**

**Winchester Water Control District and Elektra Power Corporation, Intervenors.**

**Malcolm BALDRIGE, Secretary of Commerce, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Winchester Water Control District and Elektra Power Corporation, Intervenors.**

**Nos. 83–7444, 83–7660, 83–7705 and 83–7754.**

United States Court of Appeals, Ninth Circuit.

Argued July 2, 1984.

Submitted Nov. 23, 1984.

Decided May 7, 1985.

Allen L. Johnson, Bill Kloos, Eugene, Or., for petitioner.

David C. Shilton, Dept. of Justice, Washington, D.C., for Baldrige.

Joshua Z. Rakach, FERC, Washington, D.C., Stephen T. Janik, Ball, Janik, & Novack, Portland, Or., R. Keith Guthrie, Vanness, Feldman, Sutcliffe, Curtis & Levenberg, Washington, D.C., for respondents.

Before SNEED, ALARCON and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

This appeal involves a series of orders in which the Federal Energy Regulatory Commission ("FERC") granted the Winchester Dam Hydropower Project ("Winchester Project") an exemption from federal licensing procedures under Section 408 of the Energy Security Act of 1980 ("ESA"). 16 U.S.C. § 2705(d). The National Marine Fisheries Services of the United States Department of Commerce ("NMFS") and The Steamboaters, Inc. ("Steamboaters") petition this court for review of the exemption orders. We deny the petitions in part, grant the petitions in part, rescind the exemption order, and remand for further proceedings.

*Background*

A. Statutory Framework

The central issue here is whether the Winchester Project qualifies for an exemption under Section 408 of the ESA. The Federal Power Act provides FERC with the authority to license and regulate hydropower projects. 16 U.S.C. § 797(e). In 1978, Congress passed the Public Utility Regulatory Policies Act ("PURPA"), which amended the Federal Power Act and created a class of hydropower projects that FERC could exempt from normal licensing procedures. 16 U.S.C. § 823a(a). Two years

later, in section 408 of the ESA, Congress expanded the class of exemptible projects to include hydropower projects that are located at "existing dams" and have a proposed installed capacity of 5 megawatts or less. 16 U.S.C. § 2705(d).

B. Environmental Setting

The centerpiece of the Winchester Project is the Winchester Dam, which is located on the North Umpqua River about five miles north of Roseburg, Oregon. The existing dam is a wooden structure consisting of a tied-back vertical timber bulkhead enclosing an old timber crib. An abandoned powerhouse forms the southern abutment of the dam and a concrete fish ladder and fish viewing building forms the northern abutment. The dam is owned and maintained by the Winchester Water Control District ("Winchester"), a municipal corporation.

The North Umpqua River serves as a major spawning ground for anadromous fish in the Umpqua Basin, including chinook and coho salmon, winter and summer steelhead trout, and cutthroat trout. Juvenile anadromous fish migrate down the North Umpqua to the Pacific Ocean where they mature. They return as adults to spawn in the waters above Winchester Dam. The concrete fish ladder is designed to assist adult fish migrating upstream.

C. Proposed Project

On December 18, 1982, Winchester and the Elektra Power Corporation ("Elektra") filed an application with FERC for a hydropower licensing exemption under section 408 of the ESA. Their proposed project involved a construction of a new concrete powerhouse and intake structure at the southern abutment of Winchester Dam. The new powerhouse was expected to generate approximately 8,863,000 kilowatt hours per year. The project also involved, *inter alia,* the modernization of the existing fish ladder and fish viewing station, the construction of a juvenile screening facility and trashrack to prevent juvenile fish from passing through the turbines in their down-

stream migration, and the maintenance and eventual replacement of the existing wooden dam.

### D. FERC Proceedings

Because the procedural history is quite complicated, we recite only the most relevant events. In January and February of 1983, several state and federal agencies petitioned to intervene in the proceeding before FERC regarding Winchester's application for an exemption. These agencies included NMFS, the Fish and Wildlife Service of the United States Department of Interior ("FWS"), and the Oregon Department of Fish and Wildlife ("ODFW"). All three agencies alleged that the Winchester Project could potentially have an adverse impact on fishery resources in the North Umpqua River and proposed terms and conditions to mitigate that impact. On March 28, 1983, Steamboaters, a private conservation group consisting mostly of recreational fishermen, filed a late petition to intervene that raised concerns similar to those raised by the agencies. On April 12, FERC granted all the petitions to intervene.

On April 18, FERC granted Winchester an exemption from federal licensing requirements, thereby permitting Winchester to proceed with project construction. The exemption order required Winchester to comply with any condition or terms proposed by the state and federal fish and wildlife agencies. In addition, the order noted that the issuance of the exemption was "not a major federal action affecting the quality of the human environment", *Winchester Water Control District and Elektra Power Corporation*, 23 F.E.R.C. ¶ 61,097 (1983), and therefore, FERC did not order the preparation of an Environmental Impact Statement ("EIS"). *See* 42 U.S.C. § 4332(2)(C).

During the next several months the parties filed numerous motions with FERC that challenged various aspects of the exemption order. On July 18, FERC issued an order addressing all the outstanding motions before it, including NMFS's application for rehearing, Winchester's petition seeking relief from NMFS conditions, and Steamboaters' application for rehearing of the April 18 order granting the exemption and the May 19 order rescinding intervention, as well as its complaint and request for stay. FERC made several rulings in its order. First, FERC found that Winchester was not violating any of the NMFS conditions. Second, FERC agreed with Winchester that the NMFS conditions were not binding. Third, FERC denied Steamboaters' request for a full stay because the existing stay was adequate to protect the status quo. Fourth, construing Steamboaters' complaints and the first petition for rehearing as raising the same claims, FERC noted that Steamboaters had raised an important but unresolved question whether the proposed dam modifications should affect the status of the exemption. Because it did not have enough information to resolve this question, FERC ordered an expedited hearing before an administrative law judge ("ALJ").

On September 15, after an expedited hearing before an ALJ, FERC issued an order denying Steamboaters' petition for rehearing of the April 18 exemption order. FERC held that the proposed dam modifications constituted repairs of the existing wooden dam, and therefore, the project still qualified for an exemption. FERC also held that Winchester's initial application was not deficient because it described the modifications as known at the time. Although Winchester should have amended its application once the plans for the modifications had been finalized, FERC noted that none of the interested parties had been prejudiced by Winchester's failure to amend because they had participated in proceedings where the modifications were discussed.

Steamboaters petitions for review of FERC's April 18, July 18, and September 15 orders. It contends that Winchester's application was deficient, that dam modifications disqualified the Winchester Project from an exemption because they constituted a new dam, and that FERC should have

prepared an Environmental Impact Statement. NMFS petitions for review of FERC's July 18 order, contending that its proposed conditions should have been imposed on the Winchester Project.

ANALYSIS

I

ARE NMFS CONDITIONS BINDING ON A HYDROPOWER PROJECT EXEMPTED FROM LICENSING UNDER SECTION 408 OF THE ESA?

NMFS initially sought to impose seven conditions on the project. The most important condition was number five, which barred the issuance of an exemption until NMFS had, *inter alia,* reviewed and approved the fish passage facilities and was satisfied that no adverse impacts would occur. In its order granting the exemption, FERC did not specifically discuss the NMFS conditions. NMFS then petitioned for rehearing, because the project had not complied with its conditions. Shortly thereafter Winchester requested rejection of the NMFS conditions.

Before FERC acted on the petition for rehearing, NMFS submitted a list of 21 conditions to replace its earlier list. In addition to providing NMFS with the authority to review and approve the project's measures to mitigate adverse impacts on the environment, the new conditions set forth specific guidelines for the construction, maintenance, and evaluation of fish passage facilities.

On July 18, 1983, FERC denied NMFS's petition for rehearing, noting that the exemption was not barred because NMFS had deleted condition number five from its list of conditions. FERC also held that the NMFS conditions are non-mandatory and waivable under PURPA and the ESA.

NMFS contends that FERC erred in its July 18th order on rehearing by ruling that NMFS conditions are non-mandatory and waivable. NMFS argues that FERC is required under Section 30 of the Federal

Power Act[1], 16 U.S.C. § 823a, to impose NMFS fishery conditions on hydropower projects exempted from licensing under the ESA. We disagree.

A. Appealability

A threshold issue raised by intervenors Winchester and Elektra is whether we have jurisdiction to hear NMFS's appeal. FERC ruled that the NMFS conditions were waivable, but deferred a decision on Winchester's request for a waiver until Winchester and NMFS had an opportunity to discuss the proposed conditions. FERC gave Winchester and NMFS forty-five days to reach agreement on a mutually acceptable list of conditions. They failed to reach agreement, however, and reported back to FERC after the forty-five day period had elapsed. FERC has taken no further action.

Winchester and Elektra contend that NMFS is not aggrieved by the July 18 order because FERC has not yet actually waived any of the proposed conditions. In essence, they contend that the July 18 order is not final.

■ Our jurisdiction in this case is governed by section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), which provides that any person aggrieved by an order of FERC may obtain review in the court of appeals. Although section 313(b) is not limited on its face to final orders, many courts have held that review under section 313(b) is limited to orders of definitive substantive impact, where judicial abstention would result in irreparable injury to a party. *Papago Tribal Utility Authority v. Federal Energy Regulatory Commission,* 628 F.2d 235, 238 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); *Public Service Company of New Mexico v. Federal Power Commission,* 557 F.2d 227, 233 (10th Cir.1977); *Niagara Mohawk Power Corp. v. Federal Power Commission,* 538 F.2d 966, 969 (2d Cir.1976). We adopt the three-part analysis set forth in *Papago* for determining whether an or-

**1.** Section 30 was added to the Federal Power Act by the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3148–49 (1978).

1388

der is reviewable under section 313(b): first, we ask whether the order is final; second, whether, if unreviewed, it would inflict irreparable harm on the party seeking review; and third, whether judicial review at this stage of the process would invade the province reserved to the discretion of the agency. 628 F.2d at 239.

■ The July 18 order fits all the criteria for reviewability. The order is certainly final insofar as it definitively resolves the issue whether NMFS conditions are mandatory. Although FERC did not immediately waive any of the conditions, project construction apparently proceeded without NMFS and Winchester having agreed on a mutually acceptable list of conditions. Thus, even though FERC may ultimately impose some of the NMFS conditions, the order had an immediate irreparable effect on NMFS's ability to protect anadromous fish resources. Finally, our review of the narrow legal question presented by NMFS would not unduly invade the province of FERC. *See Mississippi Valley Gas Co. v. Federal Energy Regulatory Commission,* 659 F.2d 488, 499 (5th Cir.1981). Statutory interpretation is not the exclusive province of an administrative agency.

B. NMFS Conditions

■ Our review of the decisions of the Federal Energy Regulatory Commission is limited. We examine only whether the decision was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law. 5 U.S.C. § 706(2)(A). *See Nevada Power Co. v. Federal Power Commission,* 589 F.2d 1002, 1005–06 (9th Cir.1979). As a general rule, we show great deference to an administrative agency's interpretation of the law which it is charged with administering. *Baker v. United States,* 613 F.2d 224, 227 (9th Cir.), *cert. denied,* 449 U.S. 932, 101 S.Ct. 332, 66 L.Ed.2d 157 (1980).

■ We believe that FERC properly construed the relevant statutes in this case. The provision governing Winchester's exemption is section 408 of the ESA. 16 U.S.C. § 2705(d). Section 408 provides in pertinent part that exemptions thereunder are "subject to the same limitations (to ensure protection for fish and wildlife as well as other environmental concerns) as those which are set forth in subsections (c) and (d) of section 30 of the Federal Power Act." Section 30(c) of the Federal Power Act, in turn, provides that in determining whether to issue an exemption, FERC

> shall consult with the United States Fish and Wildlife Service and the State agency exercising administration over the fish and wildlife resources of the State ... and shall include in any such exemption—
>
> (1) such terms as the Fish and Wildlife Service and the State agency each determine are appropriate to prevent loss of, or damage to, such resources....

16 U.S.C. § 823a(c). Section 30(c) clearly specifies that FERC need only impose conditions proposed by FWS or the corresponding state agency.

The legislative history of section 30 similarly indicates that only conditions proposed by FWS and the state agency are binding. The house report strongly suggests that Congress meant to include only FWS and the state agency within the scope of section 30:

> The section makes it clear that the Coordination Act shall also apply to any facility for which such an exemption is sought. Prior to the Commission's making the above determination, it must consult with the U.S. Fish and Wildlife Service and the appropriate State fish and game agency ... If either of these *two agencies* finds that the damages expected from the facility is such that the facility is not in accordance with the Coordination Act, and so advises the FPC, then the exemption may not be granted.

H.R.Rep. No. 95–543, 9th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 7659, 7673, 7717 (emphasis supplied). Nowhere in the legislative history of section 30 is NMFS mentioned.

NMFS argues, however, that the reference in section 30(c) to the Fish and Wildlife Coordination Act ("Coordination Act"), 16 U.S.C. §§ 661–666c, indicates Congress' intent that FERC consult all fish and wildlife agencies, including NMFS. The Coordination Act requires federal agencies seeking to impound, divert, or otherwise control streams or other bodies of water to first consult on conservation issues with the FWS, the Department of Interior, and the state agency exercising administration over wildlife resources. 16 U.S.C. § 662(a). Initially, the Department of Interior carried out the entire federal role under the Coordination Act. In 1970, however, an Executive Reorganization Plan transferred to NMFS the administrative responsibility for marine, anadromous, and commercial fishery resources. *See* Reorg. Plan No. 4 of 1970, *reprinted in* 5 U.S.C.A.App. 1 at 85 (West Supp.1985). NMFS contends that this transfer of functions implicitly amended the Coordination Act so that now the Coordination Act requires agencies to consult with NMFS. From this premise, NMFS goes on to argue that section 30(c), by referring to the Coordination Act, similarly requires consultation with NMFS.

We are not persuaded by NMFS's argument. NMFS essentially invites the court to amend section 30(c) to account for an alleged Congressional oversight. There is no evidence, however, that Congress inadvertently neglected to include NMFS in section 30(c). Indeed, we can presume that Congress was aware of the Coordination Act when it enacted section 30(c) and chose not to include NMFS within section 30's requirements. *See Shapiro v. United States,* 335 U.S. 1, 16, 68 S.Ct. 1375, 1383, 92 L.Ed. 1787 (1948); *Air Transport Association of America v. Professional Air Traffic Controllers Organization,* 667 F.2d 316, 321 (2d Cir.1981). In any event, we are not in the position to rewrite the plain language of section 30. That is a task best left to Congress.[2]

Our interpretation of section 30 will not leave a gap in the legislative protection of fishery resources. Both FWS and the corresponding state agency still retain the authority to impose conditions. Their administrative responsibility is broad enough to ensure vigorous protection of fishery resources. Moreover, our ruling does not exclude NMFS from the exemption process. Indeed, NMFS still retains an active advisory role.

**2.** NMFS argues that FERC's regulations conflict with its decision in this case. Under 18 C.F.R. § 4.106(b) (1984), an applicant for a section 408 exemption is required to comply with any conditions that "any Federal or state fish and wildlife agencies have determined are appropriate...." FERC regulations define fish and wildlife agencies to include NMFS if anadromous or estuarine fish are affected. 18 C.F.R. § 4.102(c) (1984). The regulations thus appear to make NMFS conditions mandatory and nonwaivable.

The question is whether FERC should be able to disregard a regulation or regulatory interpretation that conflicts with the language of the governing statute. Ordinarily, an agency is supposed to follow its own rules and regulations. *United States v. Coleman,* 478 F.2d 1371, 1374 (9th Cir.1973). Indeed, we have recognized the principle that federal courts will require federal agencies to abide by their own regulations, even where the regulations are more generous than required by law. *United States v. Newell,* 578 F.2d 827, 834 (9th Cir.1978). On the other hand, numerous courts have held that an agency can change previously announced policies, or fashion exceptions and qualifications, so long as

it explains departures from agency policies or rules apparently dispositive of the case. *See Atchinson, Topeka & Santa Fe Railway Co. v. Witchita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973); *Basic Media Ltd. v. FCC,* 559 F.2d 830, 833 (D.C.Cir. 1977); *Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255, 1264 (4th Cir.1974). For instance, an agency can certainly repudiate a rule that is not consistent with the statutory policies of the governing statute. *See Atchison, Topeka, & Santa Fe Railway,* 412 U.S. at 808, 93 S.Ct. at 2375.

We believe that FERC properly refused to interpret its regulations as making NMFS conditions mandatory. Such an interpretation would have conflicted with the clear language of section 30 of the Federal Power Act. We also note that FERC recently amended its regulations to clarify that NMFS does not have the authority to impose binding conditions on small hydropower projects seeking exemptions under the ESA. *See* Fed.Reg. 11677, 11687, 11688 (1985) (to be codified at 18 C.F.R. §§ 4.30(b)(9), 4.94(b), 4.106(b)) (issued March 20, 1985). Thus, whatever conflict may have existed when FERC decided this case has been eliminated.

## II

### SHOULD FERC HAVE DENIED THE EXEMPTION BECAUSE WINCHESTER'S APPLICATION FAILED TO DESCRIBE PROPOSED DAM MODIFICATIONS IN DETAIL?

Steamboaters first argues that Winchester's application for the exemption is deficient because it failed to describe adequately dam modifications Winchester planned to undertake, and therefore, FERC and other agencies were unable to properly perform their review and consultation functions. FERC rejected this argument on rehearing, noting first that the application technically complied with FERC regulations, and second that, although Winchester should have amended its application, its failure to do so was not prejudicial because the interested parties had sufficient notice and information regarding the planned modifications before a final exemption order was issued.

FERC regulations require an application for an exemption under section 408 to include a "description of the nature and extent of any repair, reconstruction or other modification of a dam that would occur in association with construction or development of the proposed small hydroelectric power project." 18 C.F.R. § 4.107(c)(8) (1984). Winchester's application provided the following description of the dam modifications:

#### 4.107(c) Dam Maintenance

A schedule of maintenance and eventual replacement of the dam is being drafted in conjunction with the Oregon Department of Water Resources, Dam Safety Division. No change in the surface area or surface evaluation of the reservoir is anticipated....

#### Dam Safety

In order to address concerns by the Department of Water Resources' Division of Dam Safety for future dam reconstruction and repair needs, the applicants have agreed to establish a trust fund for such work. A portion of the revenue received through the production of power will be set aside solely to assess, maintain and rebuild Winchester Dam. Joint Appendix at 15, 22–23. The application did not provide a detailed description of or blueprint for the dam modifications.

Winchester's application satisfied the requirements set forth in section 4.107(c)(8). When Winchester filed the application, it had not finalized plans for the dam modifications. Thus, a detailed description was not available at the time. The initial application sufficiently notified FERC and the general public that modifications would be made and identified the state agency overseeing the drafting of plans.

 The remaining issue therefore is whether Winchester should have amended the application once its plans were finalized, and if so, whether its failure to do so should have barred the exemption. The first question is whether Winchester had a duty to supplement its application. The specific regulations governing section 408 exemptions do not provide for the amendment or supplementing of applications. General FERC regulations, however, provide that "[a]ny participant ... may seek to modify its pleading by filing an amendment which conforms to the requirements applicable to the pleading to be amended." 18 C.F.R. § 385.215(a)(1) (1984). Although section 385.215 does not require amendments, we believe that Winchester should have amended its application under section 385.215 by providing a detailed description of the dam modifications. FERC is unable to carry out its legislative responsibilities unless it receives a complete description of the hydropower project. Dam repairs or modifications are an important aspect of any hydropower project and raise significant environmental issues that FERC should at least ponder.

 We do not believe, however, that Winchester's failure to provide a detailed description should bar the exemption. FERC has the discretion to waive or relax filing requirements. *Papago*, 628 F.2d at 247; *City of Groton v. Federal Energy Regulatory Commission*, 584 F.2d 1067, 1070 n. 8 (D.C.Cir.1978). *See also Ameri-*

*can Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547 (1970). We will not review the exercise of such discretion "except upon a showing of substantial prejudice to the complaining party." *Id.* Steamboaters has failed to make such a showing here.

■ The primary purpose of the filing requirements under section 408 is to provide FERC with the requisite information to determine whether to grant an exemption. *See id.* at 538, 90 S.Ct. at 1292 (ICC filing rules "were promulgated for the purpose of providing the 'necessary information' for the Commission 'to reach an informed and equitable decision' on temporary authority applications"); *Papago,* 628 F.2d at 247 (FERC rate filing requirements were intended "to provide the Commission with the information necessary to decide whether an investigation and suspension of proposed rates should be ordered"). A secondary purpose is to give the public adequate notice of and opportunity to comment on the proposed hydropower project. Here, both of these purposes were met despite Winchester's failure to amend its application. First, by virtue of the expedited ALJ hearing, FERC had an opportunity to thoroughly review the proposed dam modifications in detail before issuing the final exemption order. Second, before the April 18 exemption order, Winchester submitted a description of the planned modifications to the Oregon Water Resources Department (OWRD). All the interested parties either participated in or were aware of proceedings before the OWRD and had access to the plans. Thus, the parties had an adequate opportunity to review and comment upon the modifications.

## III

IS THE WINCHESTER PROJECT LOCATED AT AN EXISTING DAM SUCH THAT IT QUALIFIES FOR AN EXEMPTION?

Steamboaters next contends that the Winchester Project does not qualify for an exemption because it is not connected with an "existing dam," as defined by statute and FERC regulations. Steamboaters allege that the proposed modifications will result in a new dam that is a structurally self-sufficient facility, rendering the existing wooden dam obsolete. FERC rejected Steamboaters' contention on two alternative grounds: (1) the modifications constituted only repairs or reconstruction of the existing wooden dam and not a new dam; and (2) the modifications are not connected with the hydropower project and do not affect its exempt status. We believe the record supports the first ground. Thus, we need not consider the second ground.

Both the ESA and FERC regulations define an existing dam to be "any dam, the construction of which was completed on or before April 20, 1977, and which does not require any construction or enlargement of impoundment structures (other than repairs or reconstructions) in connection with the installation of any small hydroelectric project." 16 U.S.C. § 2708(a)(6); 18 C.F.R. § 4.102(b) (1984). FERC has interpreted the "existing dam" definition in a series of orders establishing the exemption program. In Order No. 106–A, FERC concluded that a dam is not an "existing dam" where little or none of the original impoundment remains. Other relevant factors include whether the project will require extensive new dam construction, will result in the inundation of additional land, or will raise the level of the water impounded. *Id.*

■ Applying these principles to the case at hand, we find FERC's determination that the modifications constitute repairs and not a new dam to be supported by substantial evidence. *See* 16 U.S.C. § 8251(b) (FERC factual findings to be affirmed if supported by substantial evidence). Winchester undertook to repair the existing dam upon the recommendations of state and federal engineers. Winchester provided the OWRD with the following description of the modifications:

> The diversion dam to be constructed as part of this project in the low water period of 1984 will be a replacement of

the tied-back timber portion of the existing dam. The new dam will have a concrete ogee section anchored to bedrock. The height of the dam varies from about 19 feet in the main channel to about 9 feet at the north end near the existing fish ladder. The new dam will be 372 feet long and constructed immediately downstream of the existing timber dam. The downstream face of the timber dam will be used as the forms for the upstream portion of the new dam.

Joint Appendix at 777–78. It is undisputed that the concrete addition will not result in a material increase in the hydraulic height of the existing wooden dam or raise the surface elevation of the lake behind the dam. Moreover, the wooden dam will remain in place after the modifications are completed.

Steamboaters offers no support for its contention that the concrete dam will completely replace the wooden dam. The existing dam is not so defective that it serves no function. Although several agencies determined that the wooden dam needed repair and eventual replacement, the Oregon Water Policy Review Board found that the dam was not presently unsafe. Indeed, the hydropower project will operate for several months before the modifications are completed. Thus the Winchester Project is presently using an existing impoundment to generate its power.

## IV

## SHOULD FERC HAVE PREPARED AN ENVIRONMENTAL IMPACT STATEMENT BEFORE ISSUING AN EXEMPTION IN THIS CASE?

Steamboaters' main argument on appeal is that FERC should have prepared an Environmental Impact Statement before issuing its exemption order. Steamboaters contends that FERC failed not only to explain adequately its findings, but also to consider the effect of the proposed dam modifications. FERC responds that its decision not to prepare an EIS is supported by the findings of state and federal fish and wildlife agencies. Because of the close

questions raised by the parties' contentions, we requested amicus curiae briefs from the Oregon Department of Fish and Wildlife and the United States Fish and Wildlife Service.

The National Environmental Policy Act (NEPA) mandates the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment ...." 42 U.S.C. § 4332(2)(c). We will not reverse an agency's determination that a particular project does not require the preparation of an EIS unless it is unreasonable. *Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172, 1177 (9th Cir.1982). The standard for determining whether to prepare an EIS is whether "the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor." *Id.* at 1178 (quoting *Columbia Basin Land Protection Association v. Schlesinger*, 643 F.2d 585, 597 (9th Cir.1981) (emphasis in original)). The plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS *must* be prepared. *Foundation For North American Wild Sheep*, 681 F.2d at 1178 (emphasis in original). After considering the various arguments presented by the parties and the amicus briefs we conclude that FERC's decision not to prepare an EIS is fatally flawed in several respects.

### A. Environmental Assessment

First, FERC inexplicably failed to prepare an Environmental Assessment (EA) before making its decision. NEPA-implementing regulations promulgated by the Council on Environmental Quality (CEQ) state that "[i]n determining whether to prepare an environmental impact statement the Federal agency shall ... prepare an environmental assessment." 40 C.F.R.

§ 1501.4(b) (1984).[3] The only exception to this requirement is where the proposed project "[n]ormally does not require either an environmental impact statement or an environmental assessment...." 40 C.F.R. § 1501.4(a)(2) (1984). Nothing in the record or FERC regulations suggests that the Winchester Project is categorically excluded from the EIS or EA requirement. Thus, an EA is required.[4]

### B. Statement of Reasons

 Second, FERC failed to explain adequately its decision not to prepare an EIS. FERC merely stated in its April 18th order that

Based on the terms and conditions required by state and federal fish and wildlife agencies, the environmental information contained in the application for exemption, other public comments, and the Commission staff's independent analysis, we find that issuance of this exemption is not a major federal action affecting the quality of the human environment.

Joint Appendix at 198. FERC does not discuss the evidence presented by the various agencies or how the particular conditions placed on the project would prevent environmental damage. An "agency cannot ... avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Lower Alloways Creek Tp. v. Public Service Electric and Gas Co.*, 687 F.2d 732, 741 (3d Cir.1982). The agency must supply a convincing statement of reasons why potential effects are insignificant. *Id.* at 741-42; *see also West Chicago, Ill. v. United States Nuclear Regulatory Commission*, 701 F.2d 632, 648 (7th Cir.1983); *Arizona Public Service Co. v. Federal Power Commission*, 483 F.2d 1275, 1282 (D.C.Cir. 1973). The appellate court must be able to

determine whether the agency took a "hard look" at the potential environment impacts of the project. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *California v. Block*, 690 F.2d 753, 761 (9th Cir.1982); *Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172, 1178 (9th Cir. 1982). The statement of reasons is crucial to such a determination.

FERC's opinion gives no indication that it took a "hard look" at the evidence. This deficiency is particularly troublesome because of the serious questions raised by Steamboaters and NMFS regarding the environmental impact of the hydropower project. NMFS also criticized particular aspects of the project design. For instance, NMFS contended that Winchester's screen design would result in a greater impact velocity than NMFS criteria would permit and could dramatically affect the mortality rate among juvenile fish. In affidavits filed after April 18 order, Merret E. Tuttle, Chief of the Environmental Assessment Branch of NMFS, and Robert O. Pearce, a senior hydraulic engineer with NMFS, both expressed concern about the environmental consequences of the project. Pearce in particular criticized many of the assumptions in Winchester's initial application. Moreover, Steamboaters contends that Winchester has failed to comply with the FWS and ODFW conditions. FERC, however, does not specifically address these concerns or criticisms in any of its orders.

On appeal FERC seeks to justify its decision below by arguing that it relied on the recommendations of the Fish and Wildlife Service and the state fish and wildlife agency. "One agency cannot rely on another's examination of environmental effects under NEPA," however. *Southern Oregon*

---

**3.** A "Federal agency" means all agencies of the federal government, excluding the Congress, the Judiciary, and the President. 40 C.F.R. § 1508.-12 (1984).

**4.** The regulations CEQ promulgates for implementing the procedural provisions of NEPA are

mandatory and binding on federal agencies. *See Andrus v. Sierra Club*, 442 U.S. 347, 357, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979); *Village of False Pass v. Clark*, 733 F.2d 605, 613 (9th Cir.1984).

*Citizens Against Toxic Sprays, Inc. v. Clark,* 720 F.2d 1475, 1480 (9th Cir.1983) (quoting *Oregon Environmental Council v. Kunzman,* 714 F.2d 901, 905 (9th Cir. 1983)). The agency must independently assess the consequences of a project. *See Southern Oregon Citizens,* 720 F.2d at 1480 (Bureau of Land Management could not rely on EPA approval of herbicide). FERC's order fails to include such an independent assessment.

FERC also argues that its adoption of conditions to mitigate the impact of the hydropower project obviated the need for an EIS. Measures designed to mitigate the environmental consequences of a project may justify an agency's decision not to prepare an EIS. *See Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 860 (9th Cir.1982); *City and County of San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir.1980). *But see Foundation for North American Wild Sheep,* 681 F.2d at 1181–82 (rejecting contention that mitigation measures reduced impact of road to insignificant levels). The problem here is that FERC fails to explain specifically how the conditions would mitigate the impact of the project. Further, the proposed conditions provide only general guidelines. Their effectiveness depends on how they are applied and enforced. As we noted above, both NMFS and Steamboaters dispute whether the proposed conditions are adequate or being enforced. Again, FERC does not specifically address their contentions. Thus, we can not determine whether the imposition of the conditions adequately supports the decision not to prepare an EIS.[5]

## C. Dam Modifications

■ Steamboaters contends that FERC failed to consider the dam modifications in

determining whether to prepare an EIS. FERC responds that such a consideration was unnecessary because the parties had stipulated that the dam modifications were separate and independent from the hydropower project. We believe, however, that FERC improperly relied on the stipulation. We have developed specific tests to determine whether two different projects or two different phases of the same project must be considered jointly in determining whether to prepare an EIS. *Friends of the Earth v. Coleman,* 513 F.2d 295, 299 (9th Cir.1975) (standard for separate projects is whether completion of one project will inevitably involve an "irreversible and irretrievable commitment of resources" to the second); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285 (9th Cir.1974) (standard for separate phases of the same project is whether "it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken"). The language in the stipulation differs from those tests. Moreover, the stipulation does not purport to address the EIS issue. Thus, on remand, FERC should apply the appropriate test to determine whether the dam modifications should be considered in determining whether to prepare an EIS.

Accordingly, we reverse and rescind the order appealed from in 83–7444 granting Winchester an exemption and remand on the question whether an environmental impact statement should be prepared. We affirm the orders appealed from in 83–7660, 83–7705 and 83–7554.

---

**5.** Although we held earlier that NMFS conditions are waivable, *see supra* at 1388, we do not believe FERC is entitled wholly to ignore NMFS contentions regarding the environmental effects of the project. Moreover, FERC's determination that the conditions are waivable does not by itself satisfy the "hard look" requirement. The determination of waivability is a question of law that involves the interpretation of federal statutes and not an assessment of the conditions themselves or the concerns they address. In none of its decisions has FERC discussed the specific conditions proposed by NMFS and whether they are necessary to prevent adverse impacts.